## FEDERAL RESERVE BANK OF RICHMOND *v.* MALLOY ET AL., TRADING AS MALLOY BROTHERS.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 553. Argued January 9, 1924.—Decided February 18, 1924.

1. Generally, as held in *Exchange Natl. Bank* v. *Third Natl. Bank,* 112 U. S. 276, where a check, deposited by the owner in a bank, is forwarded by it in due course to another bank for collection, the second bank does not become responsible, as an agent, to the owner. P. 164.

2. But it is otherwise where, by a state statute with reference to which the first bank and the check-owner presumably contract, the forwarding of such instruments for collection, in the regular course of banking, is to be deemed due diligence acquitting the forwarding bank of liability until it has received actual payment, for, in such case, the initial bank has implied authority to employ another bank as subagent, and this in turn another, and the risk of their default or neglect is with the depositor of the instrument. *Id.*

3. If a bank, responsible to the payee for the collection of a check, surrender the check to the drawee bank and accept in payment an exchange draft of that bank which proves worthless, the collecting bank is liable to the payee of the check for the resulting loss. P. 165.

4. A regulation of the Federal Reserve Board providing for authority to Federal Reserve Banks " to send checks for collection " to banks on which they were drawn, cannot be enlarged by implication to include authority to accept a draft of the drawee of a check in payment. P. 166.

5. A practice of banks to send checks for collection to the banks on which they are drawn, with the expectation that they will be cancelled and charged to the makers and remittance returned either in currency or by the drawees' exchange drafts, lacks the certainty and uniformity essential to make it a custom binding the owner of a check who did not know of it. P. 169.

6. Assuming that the legal principles forbidding that a check be entrusted for collection to the bank on which it is drawn, and requiring payment in money, can be supplanted by custom, the custom must be as definite and specific as the principles themselves. P. 171.

291 Fed. 763, affirmed.

ERROR to a judgment of the Circuit Court of Appeals, which affirmed a recovery in the District Court of the amount of a check.

*Mr. M. G. Wallace* for plaintiff in error.

*Mr. Robert H. Dye* for defendants in error

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Malloy Brothers brought this action against the Federal Reserve Bank of Richmond in a state court, to recover $9,000, alleged to be the amount of a check drawn to their order upon the Bank of Lumber Bridge, North Carolina. The case was removed to the Federal District Court for the Eastern District of North Carolina, where it was tried without a jury and judgment rendered for plaintiffs, 281 Fed. 997, which was affirmed by the Court of Appeals. 291 Fed. 763.

The check was drawn on November 30, 1920, delivered to and received by plaintiffs and the amount credited

97851°—24——11

to the drawer. It was properly indorsed and deposited with the Perry Banking Company of Perry, Florida, for collection and credit, on December 1. A credit card was delivered to plaintiffs upon which was printed: " Checks, drafts, etc., received for collection or deposit, are taken at the risk of the endorser until actual payment is received."

A statute of Florida, then and ever since in force (Laws of Florida, 1909, c. 5951, p. 146) provides as follows:

" That when a check, draft, note or other negotiable instrument is deposited in a bank for credit, or for collection, it shall be considered due diligence on the part of the bank in the collection of any check, draft, note or other negotiable instrument so deposited, to forward *en route* the same without delay in the usual commercial way in use according to the regular course of business of banks, and that the maker, endorser, guarantor or surety of any check, draft, note or other negotiable instrument, so deposited, shall be liable to the bank until actual final payment is received, and that when a bank receives for collection any check, draft, note or other negotiable instrument and forwards the same for collection, as herein provided, it shall only be liable after actual final payment is received by it, except in case of want of due diligence on its part, as aforesaid."

The Perry Banking Company indorsed and transmitted the check to a bank at Jacksonville, Florida, which, in turn, indorsed and transmitted it, on account of the Atlanta Federal Reserve Bank, to a bank at Atlanta, Georgia; and by the latter bank it was transmitted for collection to the Richmond bank, defendant herein.

On December 10, 1920, the Richmond bank transmitted the check, together with several other small checks, to the Lumber Bridge bank for collection and return. The letter containing these checks, by regular course of mail, should have been received, and, so far as appears, was received, by the Lumber Bridge bank on

Saturday, December 11th.  On Tuesday, December 14th, the check in question was stamped " Paid " and charged to the account of the drawer, and on the same day the Lumber Bridge bank transmitted to the Richmond bank its draft on the Atlantic Banking & Trust Company, of Greensboro, North Carolina, for the aggregate amount of the checks, including the one here in question.  The draft was received by the Richmond bank on December 15th, and immediately forwarded to the bank at Greensboro for payment.  On December 17th the Greensboro bank notified the Richmond bank by wire that the Lumber Bridge bank did not have sufficient funds to its credit to pay the draft.  Thereupon the Richmond bank wired the Lumber Bridge bank that its draft had been dishonored and called upon it to make it good.  The Lumber Bridge bank answered, promising to do so.  It failed, however, and the Richmond bank thereupon sent a representative to Lumber Bridge, who reached there on the morning of December 20th, and demanded payment of the draft from the cashier of the Lumber Bridge bank. The cashier of that bank, after stating that it did not have sufficient funds to pay the dishonored draft promised that steps would be taken to meet it.

On December 21st the representative of the Richmond bank was informed that the dishonored draft could not be paid and on the same day the Richmond bank notified the Atlanta bank of the situation and this notice was promptly transmitted to the plaintiffs.  The amount of the check was thereupon charged by the Richmond bank to the Atlanta bank, which, in turn, charged the amount to its immediate correspondent and so on until it was finally charged back to the plaintiffs.

In view of the conclusion which we have reached, we find it necessary to consider but two questions:

1. Can the present action be maintained by plaintiffs, Malloy Brothers, against the Richmond bank? and

2. If so, did the failure of the Richmond bank to require payment of the Malloy check in money, and its acceptance of what turned out to be a worthless draft in lieu thereof, create a liability against it and in favor of Malloy Brothers for the amount of the loss?

First. The state decisions in respect of the liability of a correspondent bank to the owner of a check forwarded for collection by the initial bank of deposit are in conflict beyond the possibility of reconciliation. A number of States, following the " New York rule," so-called, have held that there is no such direct liability, but that the initial bank alone is responsible to the owner. On the other hand, an equal, if not a greater, number of States following the " Massachusetts rule," have held exactly the contrary, viz: that the initial bank by the mere fact of deposit for collection, is authorized to employ subagents, who thereupon become the agents of the owner and directly responsible to him for their defaults. This Court, in *Exchange National Bank* v. *Third National Bank,* 112 U. S. 276, after reviewing the two lines of decisions, approved the " New York rule." But the rule may, of course, be varied by contract, express or implied. *Id.* 289. Here the relations of the drawee to the initial bank of deposit are controlled by the Florida statute with respect to which it must be presumed they dealt with each other. This statute had the effect of importing the " Massachusetts rule " into the contract, with the result that the initial bank had implied authority to intrust the collection of the check to a subagent and that subagent, in turn, to another; and the risk of any default or neglect on their part, rested upon the owners. 112 U. S. 281. It follows that the action was properly brought against the Richmond bank.

Second. For the purposes of the case, we assume the correctness of the decision below, holding that the Richmond bank was not negligent in sending the check di-

rectly to the bank on which it was drawn, and consider only whether the acceptance of an exchange draft, found to be worthless, instead of money, creates an enforceable liability.

It is settled law that a collecting agent is without authority to accept for the debt of his principal anything but " that which the law declares to be a legal tender, or which is by common consent considered and treated as money, and passes as such at par." *Ward* v. *Smith,* 7 Wall. 447, 452. The rule applies to a bank receiving commercial paper for collection, and if such bank accepts the check of the party bound to make payment and surrenders the paper, it is responsible to the owner for any resulting loss. *Fifth National Bank* v. *Ashworth,* 123 Pa. St. 212, 218; *Hazlett* v. *Commercial National Bank,* 132 Pa. St. 118, 125; *Bank* v. *Bank,* 151 Mo. 320, 329; *Essex County National Bank* v. *Bank of Montreal,* 7 Biss. 193, 8 Fed. Cas. No. 4532; *Noble* v. *Doughten,* 72 Kans. 336, 351–353; *Anderson* v. *Gill,* 79 Md. 312, 317; *Bank of Antigo* v. *Union Trust Co.,* 149 Ill. 343, 351. It is unnecessary to cite other decisions since they are all practically uniform. *Anderson* v. *Gill, supra,* presented a situation practically the same as that we are here dealing with, and the Supreme Court of Maryland, in disposing of it, said:

" Now, a check on a bank or banker is payable in money, and in nothing else. Morse Banks & Banking (2d edition), p. 268. The drawer having funds to his credit with the drawee has a right to assume that the payee will, upon presentation, exact in payment precisely what the check was given for, and that he will not accept, in lieu thereof, something for which it had not been drawn. It is certainly not within his contemplation that the payee should upon presentation, instead of requiring the cash to be paid, accept at the drawer's risk a check of the drawee upon some other bank or

banker. The holder had a right to make immediate de-
mand for payment upon receipt of Anderson's check,
though she was not bound to do so. When her agent,
the Old Town Bank—the collecting bank being the agent
of the holder—(*Dodge* v. *Freedman's Sav. & Tru. Co.,*
93 U. S. 379) did make demand it was only authorized to
receive *money* (*Ward* v. *Smith,* 7 Wall. 451); and the
acceptance by the collecting agent of anything else ren-
dered it as liable to the holder as though it had collected
the cash."

Acceptance of the draft by the Richmond bank as pay-
ment of the Malloy check had the effect of releasing the
drawer and therefore materially altering the relations of
the parties. Technically, there resulted a transfer of the
drawer's funds and his right of action against the drawee
bank; and previous rights and obligations between the
owners of the check and drawer were superseded. It fol-
lows,—this result having been brought about by the un-
authorized act of the Richmond bank, standing in that
transaction in the relation of agent to the owners of the
check,—that such owners are entitled to recover from the
Richmond bank for the loss which they sustained, unless
the case falls within some exception to the general rule.

And as to this, the Richmond bank says: (1) That its
immediate correspondent, from whom it received the
check, was bound by a regulation of the Federal Reserve
Board, which authorized the method of collection pursued,
and that, since that correspondent was the agent of the
owners of the check in the transaction, they are likewise
bound; (2) that the method was justified by a custom,
binding upon Malloy Brothers. We consider these con-
tentions in their order.

1. The regulation relied on, so far as pertinent, is to the
effect that a Federal Reserve bank will act as agent only
in handling items for member and non-member banks,
who are required to authorize " its Federal Reserve bank

to send checks for collection to banks on which checks were drawn, and, except for negligence, such Federal Reserve banks will assume no liability." Regulation J (8) of 1920. This regulation, while it contemplates the sending of checks for collection to the drawee banks, does not expressly permit the acceptance of payment other than in money. It is insisted, however, that the authority to send checks to the drawee bank carries with it, by necessary implication, authority to accept a draft in payment from the drawee. We assume, for the purposes of the argument, that the obligation which the law imposes to collect only in money may be varied by a regulation, clearly and positively so providing, although, in terms, it relates only to the banks *inter se,* upon the ground that the owner of the check is bound by the knowledge and consent of his subagent. But to justify an extension by implication of the terms of the regulation, it must be made to appear, at least, that the addition sought to be annexed is a necessary means to carry into effect the authority expressly given by the regulation. See *First National Bank* v. *Missouri,* 263 U. S. 640. It follows from this limitation upon the extent and purpose of implied powers, that a distinct and independent power cannot be brought into existence by implication from the grant of another distinct power. In other words, authority to do a specific thing carries with it by implication the power to do whatever is necessary to effectuate the thing authorized—not to do another and separate thing, since that would be, not to carry the authority granted into effect, but to add an authority beyond the terms of the grant. The authority expressed by the regulation is " to send checks for collection to banks on which checks were drawn;" the authority now sought to be annexed by implication is " to accept exchange drafts in payment," instead of money, as required by law. That neither is a necessary means of carrying the other into effect, is clear. Nor are

they necessary to each other in the sense that they are corollary or dependent. Certainly a check may be sent for collection to the drawee bank without entailing the necessity of remitting the amount in the form of exchange. Currency itself may be sent; and, as will appear presently, frequently is sent. The first form of remittance, to be sure, is more convenient; but it is not of such necessity as to exclude the second on the score of impracticability. There is nothing to prevent the sending bank from requiring the drawee to remit currency as a condition upon which the check may be satisfied and charged to the account of the drawer. We must not lose sight of the fact that we are here dealing with two distinct rules of law, both of which are sought to be avoided: (a) that which forbids a bank having paper for collection to use the drawee bank as a collecting agent; and (b) that which forbids a collecting agent accepting anything but money in payment. The first rule is probably based upon the theory that the drawee is not a suitable agent for the enforcement of his own obligation, and that commercial paper calling upon him to pay should not be surrendered to and satisfied by him, with the consequent release of the drawer, except upon previous or contemporaneous payment. The second rule proceeds upon the fact that the obligation of the drawee is to pay in money and nothing else. Plainly, the two rules are of such nature that one may be abrogated without the other; and it is obvious, since the law imposes upon a collecting agent the duty to collect in money, that none of the various subagents, receiving the paper to be collected upon the basis of that duty, can waive the requirement of the law in favor of the agent to whom it is transmitted. Indeed, in transmitting the check here in question to the Richmond bank the intermediate banks, in effect, served only as instruments for effectuating the transmission. In essence and in substance the check was delivered by its owners to the

Richmond bank; it is to that bank, as we have said, they must look for redress; and the responsibility of that bank is the same as though the check had been delivered directly to it for collection by the owners.

In this connection, certain state statutes are also referred to, but, if applicable, we find nothing in them that justifies a different conclusion from that reached in respect of the regulation just considered. Their provisions are in substance the same.

2. Finally, it is urged that the acceptance of the drawee's own draft, instead of money, was justified by custom. The testimony relied upon to establish the custom follows:

" The business of check collecting is handled by the Federal Reserve Bank in a way very similar to that in which it is handled by collecting banks throughout the country. When one bank receives checks on another in a distant city, it usually sends them to the bank upon which they are drawn or to some other bank in that city, and receives settlement by means of an exchange draft drawn by the bank to which the checks are sent upon some one of its correspondents. *When checks are sent with the expectation that the bank receiving them will remit at once, we call it sending for collection and return. When this is done, the bank upon which the checks are drawn is expected to cancel the checks and charge them to the accounts of the drawers and to remit by means of its exchange draft or by a shipment of currency.* An exchange draft is used more frequently than a shipment of currency."

It thus appears that the custom, if otherwise established, does not fix a definite and uniform method of remittance. When checks are sent for collection and return, the bank is expected to cancel the checks and charge them to the account of the drawers and remit " by means of its exchange draft *or by a shipment of currency*," the

former being used more frequently than the latter. Whether the choice of methods is at the election of the drawee bank or the collecting bank does not appear. If it be the latter, it would seem to result that the election to have remittance by draft instead of currency, being wholly a matter of its discretion or even of its caprice, as to which the owners are not consulted, would be at its peril rather than at the risk of the owners of the check.

But the proof shows that the alleged custom was not known to plaintiffs; and they could not be held to it without such knowledge, because, all other reasons aside, by its uncertainty and lack of uniformity, it furnishes no definite standard by which the terms of the implied consent sought to be established thereby, can be determined. It furnishes no rule by which it can be ascertained when an exchange draft shall be remitted and when currency shall be required, or who is to exercise the right of election. "A custom to pay two pence in lieu of tithes is good; but to pay sometimes two pence, and sometimes three pence, as the occupier of the land pleases, is bad for uncertainty." 1 Bl. Comm. 78. An alleged custom to remit either in exchange or in currency at somebody's option, means nothing more than a practice sometimes to remit by exchange and sometimes not, and therefore lacks the essential qualities of certainty and uniformity to make it a custom of accepting payment by exchange draft binding upon the owners of the check. *Oelricks* v. *Ford,* 23 How. 49, 62; *Kalamazoo Corset Co.* v. *Simon,* 129 Fed. 144, 146; *Chicago, M. & St. P. Ry. Co.* v. *Lindeman,* 143 Fed. 946, 949; *Foley* v. *Mason & Son,* 6 Md. 37, 50; *Wilson* v. *Willes,* 7 East, 121, 127. A custom to do a thing in either one or the other of two modes, as the person relying upon it may choose, can furnish no basis for an implication that the person sought to be bound by it had in mind one mode rather than the other.

It is said, however, that there is a custom among banks to settle among themselves by means of drafts so well

established and notorious, that judicial notice of it may be taken.  But the usage here invoked is not that, but is one of special application to a case where the collection of a check is intrusted to the very bank upon which the check is drawn and where payment is accepted in a medium which the contract, read in the light of the law, forbids.  The special situation with which we are dealing is controlled by a definite rule of law which it is sought to upset by a custom to the contrary effect.  It is not now necessary to consider the effect of a custom which contravenes a settled rule of law or the limits within which such a custom can be upheld. . See *Barnard* v. *Kellogg,* 10 Wall. 383, 390–394.  Decisions upon that question are in great confusion.  But whatever may be the doctrine in other respects, certainly a custom relied upon to take the place of a settled principle of law, and therefore to have the force of law, ought to be as definite and specific in negativing the principle as the law which it assumes to supplant is in affirming it.

*Judgment affirmed.*