## OILTON STATE BANK v. BUTLER.

No. 17655. Opinion Filed June 12, 1928.

(Syllabus.)

Escrow—Action by Maker of Escrow Check on Failing Bank Against Escrow Bank for Negligent Handling of Check—Questions for Jury.

Where A. agrees to sell to B. certain personal property, the deal to be closed as soon as an inventory is completed therefor, and said parties agree to put the papers and money in the hands of an escrow bank pending the completion of the inventory, and where the purchase price of the personal property is represented by a check on a local bank drawn by B. payable to the escrow bank, and upon presentation of the check and papers there is evidence that the cashier of the escrow bank informed the maker of the check that he would present said check and secure therefor a draft, and the maker of the check makes no reply thereto, and thereupon the cashier secured from the bank a draft for the sum represented by the check on an out of town bank and forwarded the same for collection to its out of town correspondent, and before the draft is paid the bank issuing the same fails, in a suit by B. against the escrow bank to recover the amount of the check, where there is some evidence tending to show that B. knew the local bank on which the check was drawn was in a failing condition, there should have been submitted to the jury by the court the questions, first, whether the alleged statement made by the cashier to B. was actually made; second, whether B., possessed of such information as he had with reference to the bank's condition, should have dissented when informed that a draft instead of cash was to be secured; and third, whether the bank changed its position by reason of the failure of B. to speak; and also whether or not the escrow bank was guilty of such want of care in the premises under all the circumstances as

would have made it liable in handling the escrow check or its proceeds.

Commissioners' Opinion, Division No. 2.

Error from District Court, Creek County; O. H. Searcy, Assigned Judge.

Action by M. D. Butler against the Oilton State Bank. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Hughes, Foster & Ellinghausen, for plaintiff in error.

O'Meara & Silverman and Creekmore Wallace, for defendant in error.

DIFFENDAFFER, C. This is an action brought by M. D. Butler, defendant in error, hereinafter referred to as plaintiff, against the Oilton State Bank, plaintiff in error, hereinafter referred to as defendant, to recover the sum of $4,500. Plaintiff in his petition alleges, in substance, that on the 21st day of March, 1924, he was about to purchase from one E. A. Reap a stock of drugs owned by Reap located in Oilton, Okla.; that he and Reap went together to the Oilton State Bank for the purpose of placing therein in escrow a bill of sale for said stock and lease, together with the sum of $4,500, to be held in escrow by said bank pending the completion of an inventory of said stock then being made; that upon the completion thereof the bill of sale and lease was to be delivered to plaintiff, and the $4,500 was to be delivered to said Reap. That plaintiff issued his check for the sum of $4,500, drawn on the First State Bank of Oilton, Okla., payable to defendant; that said check was delivered to defendant by placing it in the hands of one Geo. D. Smith, its cashier, with oral instructions to collect the check and hold the proceeds pending the consummation of the deal for the drug stock; that plaintiff then had more than sufficient funds in the First State Bank of Oilton to pay the check; that defendant, on the same day, negligently and in violation of its duty in the premises, delivered up the check to the First State Bank, and had the same marked "Paid," and converted the same, contrary to the rights of plaintiff, and accepted from the First State Bank its draft drawn on the Producers National Bank of Tulsa, Okla.; that at that time the First State Bank had sufficient currency with which to pay the full amount of the check; that on Monday, March 24, 1924, before regular banking hours, the First State Bank was closed by the banking authorities of the state, because of insolvency. The consequence of which was that the draft, when presented to the Producers National Bank of Tulsa, was dishonored, and was returned to defendant; that

thereafter plaintiff and Reap, by mutual consent, canceled their contract for the sale of the drug stock, and both of them notified defendant bank to that effect, and that plaintiff then demanded from defendant the return of the $4,500, which was refused.

Defendant answered by general denial, but admitted its corporate existence, and further admitted the delivery to it of the bill of sale, lease, and check, as alleged by plaintiff. It specifically denied that plaintiff directed it to obtain the cash on said check and deposit the proceeds in defendant bank to be held there subject to plaintiff's direction; alleged that it received no consideration as such escrow holder and that it received no consideration for presenting the check to the First State Bank; that when plaintiff and Reap came to defendant bank and stated their purpose to Smith, their cashier, he informed them that neither he nor the bank would be responsible for their agreement; that thereafter Smith was handed an envelope with the following escrow directions written thereon:

"On receipt of total invoice the sum of $4,500 price of fixtures and the sum total of invoice shall be paid to E. A. Reap. The bill of sale and lease then shall be delivered to M. D. Butler."

That after receipt of this envelope, defendant through its officers advised plaintiff that the check drawn by him on the First State Bank would be presented to the First State Bank, and that it would procure for plaintiff a draft for the sum of $4,500 as was the custom between the banks of the town of Oilton, and that it would forward the draft through the usual and customary channels for collection. Defendant further answered that it did on the same day present the check to the First State Bank, and received from that bank in payment thereof a draft drawn on the Producers National Bank of Tulsa, Okla., for $4,500, which draft was immediately placed in the mail in the usual course of business for clearance; and that before same was returned the First State Bank of Oilton was closed and the draft was never paid; that it was a mere escrow holder without pay in the premises; that it received no money on plaintiff's check, so surrendered, to the First State Bank; that it is without fault in the premises, and that it is not indebted to plaintiff.

To this answer no reply was filed. The cause was tried to a jury, and at the close of the evidence the plaintiff moved the court to direct a verdict for plaintiff, and defendant requested a number of instructions,

among which was one directing a verdict for defendant. The court refused the instruction of defendant, and sustained plaintiff's motion to direct a verdict in his favor. Following this direction, the jury returned a verdict for plaintiff. Upon this verdict, after motion for new trial was overruled, judgment was entered for plaintiff, and defendant brings this appeal.

There is but little conflict in the evidence. About the only disputed question is with reference to what was said at the time plaintiff left his check with Smith, cashier of defendant bank. The undisputed evidence is that plaintiff did not have sufficient funds in his checking account in the First State Bank to cover the check, but that he had with him $7,000 in time certificates; that he told Smith that he would have to go to the First State Bank, change these certificates to his checking account. This was done. He then had more than sufficient funds to cover the check. The First State Bank, at the close of business, March 21, 1924, had cash in the bank amounting to $8,135. The bank was closed on Monday, March 24; the draft which defendant bank obtained for plaintiff's check was payable to defendant bank. It was sent to defendant's correspondent at Kansas City, and credit was taken therefor on the books of defendant. This draft was drawn on the Producers National Bank of Tulsa, Okla., and was protested there on March 25, 1924.

Plaintiff claimed, and his evidence tended to prove, that Smith was specifically requested to get the cash on the check, and defendant claimed, and its evidence tended to prove, that at the time the check was delivered to Smith that he, after plaintiff had explained to him the condition of his account in the First State Bank, stated to plaintiff that, after plaintiff had arranged his account in the First State Bank so that the check could be honored, he would send over and get a draft for the $4,500. It is not contended, however, that Smith told plaintiff that he would get a draft payable to defendant bank or on what bank he expected to obtain the draft, or where it would be sent for collection. Plaintiff and Reap denied that this statement was made, and Smith and R. H. O'Dell, who was assistant cashier of defendant bank, both testified to this statement, and both testified that plaintiff made no reply and did not in any way object.

Defendant in its petition in error sets up seven assignments of error, and argues them all in three points under one proposition as follows:

"A motion for an instructed verdict is equivalent to a demurrer to the evidence, and a demurrer to the evidence admits all the facts which the evidence in the slightest degree tends to prove and all the inferences or conclusions which may be reasonably and logically drawn from the evidence, and must be considered as withdrawing from the consideration of the jury all testimony favorable to the parties demurring."

It is well settled in this state that:

"The question presented on a motion to direct a verdict is whether, admitting the truth of all the evidence in favor of the party against whom the action is contemplated, together with such inferences and conclusions as may be reasonably drawn from it, there is enough competent evidence to reasonably sustain a verdict in favor of such party." Chickasha Investment Co. v. Phillips, 58 Okla. 760, 161 Pac. 223; Anderson v. Kelley, 57 Okla. 109, 156 Pac. 1167.

Under this rule then it must be taken as true that when Butler gave Smith the check for $4,500, Smith stated that he would send over and get a draft for it as soon as Butler arranged the account so as to cover the check; that plaintiff made defendant his agent to collect the check is plain.

The duty of an agent for such purpose in an ordinary banking transaction is stated in Federal Reserve Bank of Richmond v. Malloy, 264 U. S. 160, 68 L. Ed. 617, as follows:

"It is settled law that a collecting agent is without authority to accept for the debt of his principal anything but 'that which the law declares to be a legal tender, or which is by common consent considered and treated as money and passes as such at par.' Ward v. Smith, 7 Wall, 447, 452, 19 L. Ed. 207, 210. The rule applies to a bank receiving commercial paper for collection, and if such bank accepts the check of the party bound to make payment and surrenders the paper, it is responsible to the owner for any resulting loss."

In National Bank of Commerce v. American Exchange Bank, 151 Mo. 320, 74 Am. St. Rep. 527, it was held:

"When a bank, authorized to collect a draft for another bank, accepts a check in payment and surrenders the draft, it makes the check its own, and its liability to the bank in whose favor the draft is drawn becomes fixed as much as if it had received cash instead of the check."

The rule is stated in 21 R. C. L. 869, as follows:

"It is established by all of the authorities that the power of a collecting agent by the general law is limited to receiving for the

debt of his principal that which the law declares to be legal tender, or which is by common consent considered and treated as money, and passes as such at par. Although an agent is conceded to be a general agent with general power to sell or collect, or both, and take payment either in cash or credit, yet he does not possess all the power and authority over the property of his principal which the principal possesses and may exercise, and such general power gives an agent no authority to substitute himself as creditor in place of his principal, or transfer a debt of his principal to himself by taking in payment thereof a note payable to himself."

In National Bank of Commerce v. Shepard, 116 Okla. 113, 243 Pac. 749, where the facts were similar to those in the instant case, except as to the alleged statement by Smith of his intention to procure a draft, this court said:

"The bank on which plaintiff's check was drawn was located just across the street from the defendant bank, and it is admitted the plaintiff had ample funds in the drawee bank at the time the check was presented. The substituted draft was not paid on account of the insolvency of the drawee bank occurring after the issuance of the substituted check, and the defendant should sustain the resulting loss."

To uphold the action of the trial court in directing a verdict for plaintiff, we must say that even though Smith did make the statement that he would send over and get a draft for the check, and plaintiff did not object thereto, the bank would be liable as though this was an ordinary banking transaction, regardless of the motive that plaintiff might have had in remaining silent. This we are unwilling to do, for the reason hereinafter pointed out.

It is contended by defendant, under its second point, that:

"When Smith stated to Butler that he would procure a draft for the check, it was then Butler's duty to speak and make objection, if any he had and his failure to object estops him from asserting that the bank should have obtained the cash, or at least it amounts to an agreement on the part of Butler, that the bank might obtain a draft for the check."

Defendant requested instructions submitting the question of fact to the jury as to whether or not the statement was so made, and in effect instructing the jury that if they should find from the evidence that Smith did state to Butler and Reap that when Butler had arranged his account in the First State Bank, that he, Smith, would send over and get a draft therefor, and if they should further find that Butler made no reply thereto and did not object, then he would be presumed to have consented and agreed to such course, and that defendant bank would not be liable for the loss of the $4,500, unless it was negligent in handling the draft after it obtained it, and also offered appropriate instructions on the question of negligence in handling the draft.

The court refused these instructions, and defendant assigns this refusal as error, and contends that if Smith did so inform Butler of his intention to procure a draft for the check, and that if Butler did not object he is now estopped to assert any right as against the defendant bank, since the bank's position, if such assertion should be permitted, would be materially changed to its injury.

To sustain this contention, defendant cites Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618, where it is said:

"He who, by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted."

And Swain v. Seamens, 9 Wall 254, 19 L. Ed. 554, where the Supreme Court of the United States laid down the rule as follows:

"Where a person tacitly encourages an act to be done, he cannot afterwards exercise his legal right in opposition to such consent, if his conduct * * * induced the other party to change his position, so that he will be pecuniarily prejudiced by the assertion of such adverse claim."

In the case of Heckman v. Davis, 56 Okla. 483, 155 Pac. 1170, cited by defendant, this court stated the rule on estoppel by silence as follows:

"In order for the silence of a party to constitute an estoppel against him, it must have occurred under such circumstances as to have made it his imperative duty to speak, and the party in whose favor the estoppel is invoked must have been misled into doing that which he would not have done but for such silence."

In the case of Ash v. Mickelson, 118 Okla. 163, 247 Pac. 680, the rule is stated as follows:

"In order for the silence of a party to constitute an estoppel against him, it must not only have been his imperative duty to speak, but the party in whose favor the estoppel is invoked must have been misled into doing something to his detriment which he would not have done except for such silence."

It will thus be seen that in order for the doctrine of estoppel by silence to apply in

this case, Butler must have, by his silence, if the statement was made as claimed, had an intent to deceive, or expected in some way to benefit by the contemplated act of Smith. If such intent or expectation be had, then it would have been his imperative duty to speak and express his objections. It is urged in defendant's brief that the whole case discloses that there was a preconceived plan on the part of Butler and Reap to use the defendant bank to prevent the loss of Butler's certificates of deposit. A careful examination of the record will disclose that there is some reason for the contention. Butler admitted on cross-examination that on Friday evening, March 21, after he had transferred his certificates of deposit to his checking account, he had a conversation with Reap, or overheard a conversation between Reap and another, in which the solvency of the First State Bank was discussed, and in which he, Reap, expressed the opinion that the condition of the First State Bank was not very good. He was asked if he did not in fact go to the Oilton State Bank and give the check because he was afraid the First State Bank would fail, to which he replied that he did not. He then testified:

"Q. Isn't it a fact you went down next day and drew out two thousand dollars and you were afraid of that bank and afraid of it going to fail? A. On Saturday? Q. Yes. A. Well I had a talk with Mr. Reap about that bank in the meantime, been talking cash—no I wasn't talking to him, I overheard a conversation between he and another party about that bank Friday night and he— Q. What did he say? A. He expressed an opinion, didn't think it was very good. Q. You won't tell who it was what you heard about that bank, who and Reap had the conversation with just prior to the time you had deposited this money? A. I had no thought of the bank being in bad condition at that time. Q. The fact is you and Reap discussed the condition of the First State Bank before you selected the Oilton State Bank? A. We did not. Q. Isn't it a fact you drew out this $2,000 on Saturday because you were afraid of the First State Bank? A. Yes, sir, with the explanation I heard of the conversation."

He also testified:

"Q. Isn't it a fact the reason you drew that $2,000 on Saturday you knew the First State Bank of Oilton was in a failing condition? A. No, I didn't believe they was. Q. You did know it? A. It had been talked at different times months before then, all along."

Reap testified, in substance, that he and Butler had a conversation on Monday morning, March 24th, in which they discussed the draft, and whether or not it had been paid, and that immediately he went to Smith and inquired about the draft, and then called up two banks in Tulsa to ascertain if he could whether or not the draft had reached the Tulsa bank and had been paid. He could not tell from whom he got the information that a draft had been taken by Smith instead of the money. He later testified, however, that he thought the conversation with Smith about the draft was later in the week, some time about Wednesday the 26th. There is some evidence to the effect that the First State Bank might not have paid the $4,500 check, if cash had been demanded. Winnifred Schofield, who was assistant cashier of the First State Bank and signed the draft in question, testified:

"Q. You say that Mr. Odell didn't ask for the cash on this draft or check of Mr. Butler's? A. Said nothing about cash. Q. Had he asked for cash you wouldn't have paid it? A. I would have to, if he had insisted. Q. He would have to insist very strenuously? A. He didn't. Q. Fact is if he had insisted for cash you wouldn't have paid him? A. I would have consulted Mr. Abshire. Q. And he was there at the bank that day? A. I presume he was. Yes, he was there that day."

Mr. Abshire was the cashier.

It appears then that Butler may have had in his mind, that he would permit Smith to accept a draft for his check, and if the draft was honored he would thus get $4,500 of the $7,100 represented by his $7,000 in certificates of deposit, and the $100 interest thereon, and that if the draft was not honored and the bank in the meantime should close, that he would hold the defendant bank.

If he was thus seeking to use the defendant bank to assist him in cashing the $7,000 certificate, and had a secret intention to hold defendant liable on the draft, which Smith claims he told him he intended to get, in case same was not honored, then he would not be acting in good faith by remaining silent, when Smith told him he intended to get a draft, and he should not now be allowed to assert that it was the duty of the bank to obtain money or its equivalent on his check, as it should have done had this been an ordinary banking transaction, and the bank had accepted the check for collection in the ordinary course with nothing said about a draft.

These questions of fact, of which we think there was sufficient evidence to go to the jury, should have been submitted under proper instructions. The instruction offered by defendant does not go so far as to submit

the question of the good faith of plaintiff, to the jury, but we do think it was sufficient, to call it to the attention of the court.

All questions of fact raised by the evidence, necessary for a determination of the rights of the parties should be submitted to the jury under appropriate instructions. The question of whether or not the statement claimed by defendant was in fact made, and whether plaintiff made no objection thereto, was a material fact, when taken in connection with the other facts relative to the knowledge of plaintiff of the condition of the bank upon which his check was drawn. If this were an ordinary banking transaction and the check had been placed with defendant for collection in the usual way, without anything having been said with reference to the manner of making the collection, we have no doubt but that the rule announced in the Malloy Case, supra, would apply. But we think there might be some doubt of the applicability of the rule under the facts testified to by the witnesses for defendant.

In Exchange National Bank of Pittsburg v. Third National Bank of N. J., 112 U. S. 276, at page 289, it was said:

"Whether a draft is payable in the place where the bank receiving it for collection is situated or in another place, the holder is aware that the collection must be by competent agent. In either case there is an implied contract of the bank that the proper measure shall be used to collect the draft, and a right on the part of owner to presume that proper agents will be employed, he having no knowledge of the agents. There is, therefore, no reason for liability or exemption from liability in the one case which does not apply to the other and while the rule of law is thus general, the liability of the bank may be varied by consent, or the bank may refuse to undertake the collection."

We have no doubt, if the liability of a bank accepting a check for collection may be varied by consent, that the consent may be either express or implied.

In Exchange Bank v. Taber (Idaho) 145 Pac. 1090, it was held:

"Where a party by conduct has intimated that he consents to an act which had been done or will offer no opposition thereto, though it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he cannot question the legality of the action to the prejudice of those who have acted on the fair inference to be drawn from his conduct."

In Tobias v. Morris (Ala.) 28 So. 517, the plaintiff went to a bank with her husband and one Jones, where the husband handed a draft to the receiving teller and asked that it be deposited to plaintiff's credit, and the teller after examining the draft, handed it back to Jones, saying that plaintiff must indorse it, which she did, returning it to Jones, who handed it to the teller. The testimony of the teller was that he had the negotiations with plaintiff's husband, and was not aware of plaintiff's presence; that plaintiff's husband deposited the draft to plaintiff's credit and stated that the money would be checked out in his wife's name by him. It was further testified that the money, so deposited, was thereafter paid out on checks signed "B. Tobias," who was the plaintiff, by M. S. Tobias, who was her husband. It was held in that case, that the question whether plaintiff was estopped by her conduct from disputing her husband's authority to draw on her account was for the jury, and that it was error to instruct the jury that if they believed this evidence to find for the defendant.

We think then that the question of whether or not the statement was made by Smith, that he would send over and get a draft; and whether or not plaintiff heard this statement, and made no objection, and if so whether he was acting in good faith in the matter, should have been submitted to the jury.

There is also some question in the case as to the good faith of the bank in taking the draft, payable to itself, and sending it to its own correspondent in Kansas City to be forwarded to Tulsa for collection, while on the same day it took a draft from the First State Bank for some $231, due it in settlement of accounts between the two banks, and sent it direct to its correspondent in Tulsa.

There is some evidence tending to show that the bank by sending the draft to its correspondent at Kansas City would have received interest on the item while in process of collection, though this is by no means clear. The question of the good faith of the bank, as well as that of plaintiff, is a question of fact to be submitted to the jury under proper instructions.

Defendant also complains of the refusal of the trial court to instruct the jury on the question of its care and diligence or want thereof in handling the draft. The court would no doubt have given proper instructions on this point, had he not concluded that under the evidence defendant was liable to plaintiff as a matter of law.

Plaintiff contends that the act of de-

fendant in taking the draft payable to itself and sending it to its correspondent in Kansas City amounted to a conversion of plaintiff's check and that of itself makes the defendant liable. We think this might have been true had the transaction been an ordinary banking transaction. We do not think, under the peculiar circumstances of this case, that the act of the bank, if the facts were as claimed by it, amounted to a conversion of the check, or its proceeds.

For the error of the court in refusing to submit these questions of fact to the jury, the judgment should be reversed and the case remanded for a new trial.

BENNETT, HALL, HERR, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 7 C. J. p. 757, §570; 21 R. C. L. p. 869; 5 R. C. L. Supp. p. 1176.