Argued October 7; reversed December 1, 1931; rehearing. denied
February 9, 1932

## BLACKFEET LIVESTOCK CO. *v.*
## NORTHWESTERN NATIONAL BANK

(5 P. (2d) 702)

*Charles A. Hart,* of Portland (Fletcher Rockwood and Carey, Hart, Spencer & McCulloch, all of Portland, on the brief), for appellant.

*Arthur D. Platt,* of Portland (Platt, Platt, Fales, Smith & Black, all of Portland, on the brief), for respondent.

RAND, J. The Blackfeet Livestock Company, a Montana corporation, brought this action against the Northwestern National Bank of Portland, Oregon, to recover the aggregate amount of eight drafts drawn upon the Portland Cattle Loan Company, Inc., a Washington corporation doing business at Portland, Oregon. The case was tried without a jury and judgment rendered for defendant. Only one witness testified and he was called by defendant. His testimony is undisputed and will be referred to later. All facts not so testified to were either admitted by the pleadings or stipulated. The question, therefore, is one of law only. The facts are these: Seven of the drafts, totaling $1,442.83, were drawn payable to the order of W. F. Allison, treasurer of Glacier county, Montana, and were delivered and accepted in payment of taxes owing by plaintiff. Tax receipts were issued therefor upon which was printed: "Checks accepted subject to collection." Those drafts were then deposited by said

county treasurer in a bank in Kalispell, Montana, and credit was conditionally given to him under a deposit slip which recited:

"In receiving checks on deposit, payable elsewhere than in Kalispell, this bank assumes no responsibility for failure of any of its direct or indirect collecting agents, and shall only be held liable when proceeds in actual funds or solvent credits shall have come into its possession. Under these conditions items previously credited may be charged back to the depositor's account. In making this deposit the depositor hereby assents to the foregoing conditions."

The other draft for $1,000 was drawn payable to the order of the First National Bank of Browning, Montana, and it was deposited conditionally in said bank to the credit of plaintiff, the condition being that the draft would be paid. The deposit slip also recited that the bank would "assume no responsibility for acts or defaults of collection agents, or other banks, or for loss in U. S. mails."

Said depositing banks thereupon forwarded said drafts by mail for collection through their respective correspondents to the defendant bank and that bank, upon receipt of them, delivered them to the Bank of Kenton, another Portland bank, and this last named bank made the collection and then closed its doors and failed to remit. Upon notice of such failure, the depositing banks countercharged its said depositors with the amounts previously credited and plaintiff was compelled to and did in fact surrender its said tax receipts for cancellation.

The drawee maintained its office in North Portland and the drafts were payable there. North Portland is not within the corporate limits of the city of Portland. It, however, is closely adjacent thereto and

only about two or three miles therefrom. It is a place of some importance industrially. The stockyards are located there and the Live Stock State Bank conducts a general banking business at that place. The Bank of Kenton, although an outlying bank which at the time was conducting business at a place three miles from the office of the drawee, was a Portland bank doing business within the corporate limits of the city of Portland.

Charles H. Stewart, who, as stated, was the only witness who testified in the case, is a former officer of the defendant bank. He testified in its behalf as follows:

"A. Well, Mr. Burke of the Bank of Kenton, in order to enlarge his collection business, I presume, had made an arrangement with two or three of the banks in Portland that he would personally pick up the remittance letters in the afternoon. He always came up to the Bank of California, where he carried his account, and he would come to our bank and I believe the United States National and pick up our remittance letters and carry them down. And we gained a day by handling it in that manner rather than mailing it. It developed into a regular practice, on the theory that we were gaining a day in making a collection rather than using the mails, which we would otherwise have done.

"Q. What other method was available to you if you hadn't made use of the Bank of Kenton?

"A. Why, I presume we could have used the Live Stock Bank in the same manner, except that we would have lost a day in making the collection. We would have had to mail it to them. * * *

"Q. Where is the Live Stock Bank?

"A. North Portland.

"Q. In close proximity to the office of the Portland Cattle Loan Company, Inc., is it not?

"A. They are both down in the stockyards district, yes.

"Q. And when you say, Mr. Stewart, that you gained a day this way, by having a representative of the Kenton Bank come into town and pick up these remittance letters, you mean that you gained a day over the time which would have been consumed had you mailed them to the Bank of Kenton?

"A. Probably in this particular instance there was no particular gain, but I was discussing for you the way that the thing—the practice had grown up. For instance, on checks that were drawn on the Bank of Kenton, had they been mailed they would have reached there the following day. Having been carried by messenger, they arrived the same day. I wouldn't say that there was any particular gain in the handling of this draft, because it probably would not have been presented until the next morning, anyway.

"Q. I think we understand each other. I just want to make it clear that when you speak of gaining time you are speaking of two alternative methods of handling through the Bank of Kenton, one by mailing to the Bank of Kenton, the other to have a representative of the Bank of Kenton call at your office down town and pick up the drafts.

"I started that explanation to explain Mr. Platt's question as to why the practice grew of handling it. Now, we would, of course, have checks of the Live Stock and Bank of Kenton. Any downtown bank in Portland would have a number of checks each day on both of those banks, and also there would be drafts by these various commission men who always drew drafts rather than checks, because they gained a little time. And because we got better service through the Bank of Kenton on their own items by the personal messenger service contributed by their cashier or president, or whatever he was, we developed the practice of handling items in that vicinity through his bank, because neither of those banks maintained credit exchange balances with us.

"Q. You say you believe this practice was followed by the United States National. Do you know that? Is that your—

"A. I could not testify that it was. It was by the Bank of California.

"Q. Of course, you know it was the Bank of California and your bank that followed this practice?

"A. That is all I can definitely testify to, although I have a conviction. * * *

"Q. Let's go into that matter of gaining time just a little bit further. You also gained, didn't you, Mr. Stewart, by following the method which you did follow, you gained a day not only over mailing to the Bank of Kenton, but over what time would have been consumed had you mailed to the Live Stock Bank?

"A. I could not definitely testify that we did, Mr. Platt, for the reason that I am not certain in my own mind that they were presented that same day. If they weren't presented until the next morning, then having mailed them to the Live Stock Bank they could have been presented the next morning. Items on the Bank of Kenton, of course, did reach there earlier.

"Q. Then it was a question of either gaining a day or breaking even?

"A. There was no loss of course, of time."

From this testimony it appears that the drafts were not transmitted by mail to the Bank of Kenton but were delivered over defendant's counter to an officer of the Bank of Kenton, who in person delivered them to his own bank. Under this state of facts, plaintiff contends that upon defendant's receipt of the drafts for collection, if unwilling to accept them for collection, it should have declined to do so and that, since it did accept them for collection, it had the right and it was its duty to do one of two things only, either to transmit them by mail to the Live Stock State Bank in North Portland for collection, where the drawee had its office and where the drafts were payable, or else to collect them through some officer or agent of its own; that it had no implied authority to employ another Portland

bank to do for it the very thing which it had undertaken to do and that, in delivering the drafts over its own counter to the Bank of Kenton for collection without the knowledge or concurrence of the owner of the paper, it made the Bank of Kenton its own agent for whose default it is responsible.

There is an irreconcilable conflict in the decisions in respect to the liability of a corresponding bank to the owner of commercial paper forwarded for collection by the initial bank of deposit. The doctrine of the cases which follow the so-called New York rule is that where paper payable at a distance is taken by a bank for collection and transmitted to its correspondent at the place of payment, the correspondent is the agent of the transmitting bank and not of the owner and that the initial bank of deposit, therefore, is liable in the absence of a general custom or special agreement to the contrary for the defaults of its correspondents. Where this doctrine prevails, the initial bank of deposit is responsible for the conduct of every subagent assisting in the collection of commercial paper and is liable not only for moneys collected but also for any loss or damage resulting to the owner from any act of negligence or default of any subagent. Under this rule the initial bank of deposit has a remedy over against the correspondent for all such defaults of the latter as render the former liable to the owner. The reason for the rule seems to be that the contract between the initial bank of deposit and the owner is held to be a contract for collection and not merely a contract for transmission and that the initial bank, having undertaken to make the collection, is responsible for the acts of those whom it employs to aid it in the performance of its undertaking.

The best exposition which we have found of the Massachusetts rule is that made in *Fabens v. Mercantile Bank*, 23 Pick. (Mass.) 330 (34 Am. Dec. 59), where it was held that:

"When a note is deposited with a bank for collection, which is payable at another place, the whole duty of the bank so receiving the note in the first instance is seasonably to transmit the same to a suitable bank or other agent at the place of payment. And as a part of the same doctrine, it is well settled that, if the acceptor of a bill or promisor of a note has his residence in another place, it shall be presumed to have been intended and understood between the depositor for collection and the bank, that it was to be transmitted to the place of the residence of the promisor, and the same rule shall then apply as if, on the face of the note, it was payable at that place."

Also, see Selover, Bank Collections, section 99.

1 Morse on Banks (6th Ed.), section 274, states the rule thus:

"The Massachusetts rule is, that when the first bank transmits the note with proper instructions to a reputable and proper agent, either in the place where the collection is to be made, or in the place nearest thereto where it has a correspondent or agent whom it deems fit to employ for the purpose of forwarding, it has done its duty, and is not responsible for the negligence of the correspondent or its agents."

The federal Supreme Court, in stating the reason for the adoption of the Massachusetts rule by the courts which follow it, said:

"* * * The authorities which support this rule rest on the proposition, that since what is to be done by a bank employed to collect a draft payable at another place can not be done by any of its ordinary officers or servants, but must be entrusted to a subagent, the risk of the neglect of the subagent is upon the party employing the bank, on the view that he has

impliedly authorized the employment of the subagent; and that the incidental benefit which the bank may receive from collecting the draft, in the absence of an express or implied agreement for compensation, is not a sufficient consideration from which to legally infer a contract to warrant against loss from the negligence of the subagent." *Exchange National Bank v. Third National Bank,* 112 U. S. 276 (5 S. Ct. 141, 28 L. Ed. 722).

From the above it will be seen that there was a special agreement entered into at the time the drafts were deposited in the Montana banks for collection that said banks should not be liable except for their own acts and conduct. This special agreement took the case out of the operation of the New York rule in so far as it limits the remedy of the owner of commercial paper deposited for collection to recover from the initial bank of deposit only. Again, the Massachusetts rule had been adopted in the state of Montana by legislative enactment and was in force at the time these deposits were made. *Jensen v. Laurel Meat Co.,* 71 Mont. 582 (230 P. 1081). Hence, the case comes within the rule announced in *Federal Reserve Bank v. Malloy,* 264 U. S. 160, (44 S. Ct. 296, 68 L. Ed. 617, 31 A. L. R. 1261), where the court said:

"* * * But the rule [New York rule] may, of course, be varied by contract, express or implied. Id. 289. Here the relations of the payee to the initial bank of deposit are controlled by the Florida statute with respect to which it must be presumed they dealt with each other. This statute had the effect of importing the 'Massachusetts rule' into the contract, with the result that the initial bank had implied authority to intrust the collection of the check to a subagent, and that subagent, in turn, to another; and the risk of any default or neglect on their part rested upon the owners. 112 U. S. 281. It follows that the action was properly brought against the Richmond bank."

■ Although under the rule above stated the rights, duties and obligations of the initial banks to their customers are to be determined by the law of the state in which the original deposits were made, yet the transaction involved here occurred wholly within this state and involves the acts of an Oregon bank for which plaintiff may recover if defendant is liable; nevertheless defendant's liability depends upon the laws in force in this state at the time the transaction occurred. The defendant was one of a chain of correspondent banks engaged in the collection of commercial paper and the rule in such case is that the liability of each bank in the chain of collection is fixed by the laws of the state where it conducts its business. At the time of this transaction the statute of this state provided that:

"Any bank * * * doing business in this state, receiving for collection or deposit any check, note or other negotiable instrument drawn upon or payable at any other bank or trust company located in another city or town, whether within or without this state, may, at its own option, forward such instrument for collection directly to the bank on which it is drawn or at which it is made payable, or may forward such collection through the federal reserve bank or other agency, and in payment of such collection such bank, banker, trust company, federal reserve bank or other agency may accept the exchange or draft of the collecting bank or payor bank. Such method of collection shall release the forwarding bank and intermediate agencies from any liability in the event of insolvency or other default of the collecting bank or payor bank or any correspondent on which its exchange or draft may be drawn." Laws 1925, chap. 207, section 126.

■ That statute was first amended by chapter 380, Laws 1929, section 22-1414, Oregon Code 1930, but the amended act was repealed by chapter 138, Laws 1931.

The repealing act, as did the amended act, authorizes a bank receiving items for collection to forward them to any other banking agency whether in the same or another city and releases the first bank of liability in event of default of the collecting bank notwithstanding the fact that such collecting bank may or may not be located in the same city or town, thereby authorizing the doing of the very thing of which plaintiff now complains. Under the statute before the amendment and the passage of the present law, the authority to forward to another banking agency in the same city or town papers received for collection did not exist by virtue of any statutory provision and, hence, if defendant had the authority to do the acts complained of at the time this transaction was had, it must be found outside the statute.

■ Under the Massachusetts rule and also under the holding of the Malloy case, defendant, upon receiving these papers for collection became the agent of the owner and responsible to it for its own defaults. If it had authority to deliver these papers over its own counter to another bank also doing business in Portland and thereby substitute such bank as an agent of the owner, then it would not be liable for the default of that bank if that bank had been selected by the exercise of due care upon its part, while if it did not possess such authority, the bank to whom the papers were delivered did not become the agent of the owner but was the agent of the defendant for whose defaults it is responsible. It is not claimed that the defendant had express authority for delivering these papers to the Bank of Kenton and, since there was no statutory authority for its doing so, it can be relieved from liability for the default of the Bank of Kenton only

upon the ground that it had implied authority or that such was the general custom of banks, for the rule is as stated by Selover that, in contracting for mutual arrangements for collections, banks are presumed to agree that each will act according to the general well established and recognized rules and customs of the banking business. Selover, Bank Collections, section 80.

■■ It is a well established rule of law that an agent can do for his principal only that which his principal authorizes and that if the principal appoints an agent to act for him as his representative in any particular business, this agent has not thereby a right to make another person the representative of his principal. Hence, a substitute of an agent who had no authority to appoint him cannot be held as the agent of the original principal but is only the agent of the agent who employs him, but if a principal constitutes an agent to do a business which obviously and from its nature can not be done by the agent otherwise than through a substitute, or if there exists in relation to that business a known and established usage of substitution, in either case the principal would be held to have expected and, therefore, authorized such substitution. 1 Parson on Contracts, sections 83-85; Tiffany on Agency, sections 27 and 28; 1 Mechem on Agency, (2d Ed.), sections 305 and 306.

■■ Under the Massachusetts rule, which we hold to be applicable here, where commercial paper payable at a distance is deposited in a bank for collection, the owner is presumed to know that the bank can not send one of its officers or agents to make the collection and that, in order to accomplish its undertaking, the bank must select some other bank or agent to assist in its collection. Hence, by depositing such paper in a bank

for collection, the owner makes the bank his agent for the purposes of transmission and impliedly authorizes it to select a suitable and proper correspondent or agent at or in the vicinity of the place where the paper is payable and, having seasonably transmitted the paper to the agent or correspondent so selected, the bank can only be held responsible for the exercise of due care and diligence in making the selection. The bank is not compelled to send the paper directly to the place of payment, but, as held in the Malloy case, has implied authority to intrust the collection of the paper to a subagent and that subagent in turn to another; and the risk of any default or neglect on their part rests upon the owner.

■ Here, the papers were received by defendant at Portland and were payable at an outlying town in the immediate vicinity of defendant's place of business and, since the Live Stock State Bank was transacting business at the place of payment, if its selection had been deemed suitable and proper, the defendant could have transmitted the papers to it and thereby discharged itself of all liability upon its part. If it did not desire to do so, not having declined to make the collection as it could have done, was it its duty to make the collection itself through some officer or agent of its own or could it delegate its authority to the Bank of Kenton and thereby relieve itself of all responsibility in connection with the matter? When the defendant received the papers they were not payable at a distant place but in the immediate vicinity of the bank and the defendant could have collected them as readily and as easily as did the Bank of Kenton. There was, therefore, no reason or necessity for the delegation of the duty to the Bank of Kenton nor for the substitution of that bank for the defendant as the

agent of the owner. It is true the Bank of Kenton was an outlying bank doing business a few miles nearer to the place of payment than was the defendant. But this small difference in the distance could not in itself alone relieve the defendant of its responsibility to the owner of the paper.

We think that when defendant received these papers for collection, if it had been unwilling to transmit them to a suitable agent at North Portland where they were payable, or to make the collection through its own officers or agents, it was its duty to decline the collection and return them to the bank from which they had been received, and that it had no implied authority to do anything else. If defendant had transmitted them to a suitable agent at North Portland, it would have made itself an agent for transmission only, but by retaining them for the purpose of having them collected, whether through its own officers and agents or another bank in the same city, it constituted itself the agent of the owner for collection and made whatever instrumentality it employed its own agent and not the agent of its principal.

The question involved here is one of agency and the cases in which an agent may appoint another as the agent of his principal are exceptions to the general rule, for the rule ordinarily is that an agent appointed for a particular purpose can not delegate his authority to anyone else. 2 C. J. 686. We think that this case does not come within any exception to the general rule. The defendant treated these drafts as local items readily collectible by a Portland bank. As to local items the duty of the bank receiving them for collection is to collect them. 1 Morse on Banks and Banking, (6th Ed.), section 227. And it would seem that this duty,

in the absence of statute or the express permission of the owner, could not be delegated to another bank in the same city. If done, the risk of the consequences rests with the first bank. This is pointed out by Morse in section 243, as follows:

"* * * There can be no real necessity for the employment of any intermediate agencies, where the collecting bank and the drawee bank are both in the same place. If the collecting bank, without distinct permission, sees fit to have recourse to them, it does so at its own risk of all the consequences which may result."

This statement of the law by Morse was quoted with approval in *Givan v. The Bank of Alexandria* (Tenn.), 52 S. W. 923 (47 L. R. A. 270).

The Massachusetts rule is based upon the necessity which confronts an initial bank of deposit to forward papers payable at a distant place to such place for collection and that, since the depositor is presumed to have expected and intended that the papers should be so forwarded, he impliedly authorized the forwarding of them and, therefore, the bank of deposit, in forwarding them to a suitable and proper correspondent, has performed its full duty and is responsible only for the exercise of due care and diligence in making the selection. But when these papers came into the hands of defendant, no such necessity existed, for the papers could be and were in fact collected by another Portland bank. Unquestionably the defendant had implied authority to transmit them for collection to a proper and suitable agency at North Portland and, if it had done so, the agent to whom they had been transmitted would have become the agent of the owner and defendant would not have been liable for its defaults, but since they could be collected and were in

fact collected by another Portland bank, no necessity existed for the delivery of them to another Portland bank and, therefore, there was no implied authority of defendant to make such delivery and the bank to which they were delivered thereby became the agent of defendant and not the agent of the owner. When these papers were deposited in the Montana banks, the depositors had no reason to expect that when they reached the place where they could be collected the bank receiving them would intrust their collection to another bank in the same city and, not having expected or intended that such should be done, authority to do so can not be implied. Under the facts in the instant case the defendant was authorized to constitute itself either an agent for transmission or an agent for collection and, having exercised the choice of undertaking their collection through another bank in the same city, it is responsible for its defaults.

Defendant contends that, since it is the established custom and usage of many small outlying banks in a large city, having no correspondents of their own to which paper left with them for. collection may be forwarded, to use other banks in the same city for their transmission, the same authority exists for a bank receiving them for collection at the place of payment to intrust their collection to another bank in the same city. The cases are not parallel. In the first case stated the outlying bank acts only as an agent for transmission while in the last case stated the receiving bank acts as an agent for collection. The duties of an agent merely for transmission and that of an agent for collection are entirely dissimilar. This distinction was recognized in 1 Daniels on Negotiable Instruments (6th Ed.), § 345. Also see *Columbia Overseas Corp. v. Banco Nacional Ultramarino,* 198 App. Div. 699 (191 N. Y. Supp. 85);

*Tillman Co. Bank v. Behringer,* 113 Tex. 415 (257 S. W. 206, 36 A. L. R. 1302, and note). Having undertaken the collection, the defendant was bound to perform its undertaking and was responsible for the collection when made whether made through its own officers or agents or through the agency of another bank employed by it for that purpose. By having undertaken to make the collection, defendant's duty was to make the collection and not merely to procure it to be done, and since these papers were delivered to the Bank of Kenton without the knowledge or concurrence of the owner, defendant is responsible for the acts of the agent which it voluntarily selected to do for it what it could as well have done itself through its own officers and agents. A bank which undertakes to collect paper is bound to keep within the authority conferred upon it. *Omaha Nat. Bank v. Kiper,* 60 Neb. 38 (82 N. W. 102).

It appears from the testimony offered on behalf of defendant, which we have copied in full, that defendant and one other Portland bank were in the habit of delivering to the Bank of Kenton checks and drafts payable at North Portland. Presumably the other banks of Portland did not follow that custom. This court said in *Kershaw v. Ladd,* 34 Or. 375 (56 P. 402, 44 L. R. A. 236), that:

"* * * Where a party employs a bank to make a collection at a place distant from where the bank is located, and nothing is said touching the specific manner of making the same, it must be presumed it was intended by the customer of the bank that the collection would be made in the usual and ordinary manner, and in accordance with the general usage and custom prevailing among banks. If the collection is made in accordance therewith, the bank has performed its undertaking."

Since this collection was not made in the usual and ordinary manner in which the banking business is conducted either in Portland or elsewhere, nor in accordance with the general usage and custom prevailing among banks, defendant's liability can not be avoided upon that ground and, since defendant had authority to transact this business in a particular manner and had no implied authority to transact it in the manner in which it was transacted and since a loss resulted to plaintiff which would not have ensued if the authorized manner of making the collection had been followed, it follows that defendant is liable to plaintiff for the ensuing loss.

The judgment appealed from, therefore, will be reversed and the cause will be remanded to the court below with directions to enter judgment in favor of plaintiff for the amount of the drafts with interest from the date of their collection.

Bean, C. J., Rossman and Kelly, JJ., concur.