# OSAGE NATIONAL BANK v. FEDERAL RESERVE BANK OF MINNEAPOLIS.[1]

September 18, 1931.

No. 28,039.

*Shearer, Byard & Trogner,* for appellant.
*Ueland & Ueland,* for respondent.

DIBELL, J.

Action to recover the amount of two checks drawn by the treasurer of Williams county, North Dakota, upon the Williston State Bank in favor of the plaintiff, Osage National Bank (of Iowa). One was for $2,022.30 and the other for $6,420. They came to the

[1]Reported in 238 N. W. 44.

defendant reserve bank in due course of clearance and for collection and remittance of proceeds. Their course is hereafter shown. There were findings and judgment for the defendant. The plaintiff appeals from the judgment.

■ The evidentiary facts are not much in dispute. The plaintiff is a member bank of the Federal Reserve Bank of Chicago in the seventh reserve district. The Corn Exchange National Bank of Chicago is also a member bank. The defendant is a reserve bank of the ninth reserve district. The Williston State Bank is a state bank of North Dakota within the ninth district but not a member bank of the defendant. It is on the par list of the defendant. On March 15, 1921, the plaintiff was the owner of two checks drawn payable to its order by the treasurer of Williams county, North Dakota, for $2,022.30 and $6,420, respectively, both dated March 11, 1921, upon the Williston State Bank of Williston, North Dakota. . The plaintiff indorsed them "pay to the order of any bank or banker" and forwarded them to the Corn Exchange National Bank of Chicago. They were inclosed in a form letter reading: "We inclose for collection and credit." The Corn Exchange National Bank received the checks on March 16, 1921, gave plaintiff credit therefor, and notified it that it credited the checks "subject to final payment." On the same day it sent the checks, indorsed "pay to the order of any bank, banker or trust company," to the defendant reserve bank at Minneapolis in a form letter stating that they were inclosed "for credit" and containing instructions as follows:

"We inclose for credit items stated below. Wire nonpayment items $500.00 or over, or those listed 'T. N. P.' Do not protest items $10.00 or under, items listed 'No Pro.' or any items bearing stamp (N 2/5 P) or similar authority of a preceding indorser. Protest all items not covered by above instructions."

On March 17, 1921, the defendant indorsed the checks "pay to any bank, banker or trust company," and forwarded them by mail to the drawee bank, Williston State Bank. They were forwarded for collection and returns with instructions similar to those given by the Corn Exchange National Bank as follows:

"We inclose the following items for collection and returns. Do not hold items for any reason whatever. Wire nonpayment of items of $500.00 or over. Do not protest items of $10.00 or under or those bearing this stamp—No Pro. 17.8—or similar authority of a preceding bank indorser. Protest All Other Items.

"Return this letter with your draft.

"Date 3 17."

On March 22, 1921, the Williston State Bank marked the checks paid and charged them to the account of the county treasurer of Williams county. The treasurer had on deposit sufficient funds to pay them. The bank returned the checks to him by mail on March 30, 1921, canceled. On March 24, 1921, and again on March 30, 1921, the defendant advised the Corn Exchange bank by letter that it was without returns on the checks. In both of these letters it said:

"We communicate this information to you for such action as may seem best to you under the circumstances."

The Corn Exchange bank did not answer. It claims that it did not receive them. On March 26, 1921, the defendant wired the Williston bank asking it to wire disposition of the checks. On March 28, 1921, the Williston bank wired:

"Matter referred to your telegram twenty sixth has been taken care of."

On March 29, 1921, the defendant wrote the Williston bank suggesting in effect that unless payment was made it would be necessary to make demand at the counter for cash. In part it said:

"It has been necessary that we telegraph to you & telephone to you in an effort to secure some satisfaction for the amounts of these cash letters, but to the present writing have only your telegram sent the 28th, which says that the matter has been taken care of. Had these remittances been paid immediately upon receipt, such payment should have been in our hands long ago and even had they been remitted for when your telegram of the 28th was sent, we believe remittance should have been in our hands this morning.

"Under these circumstances we are under the impression that our remittances are not receiving your prompt and careful attention, and we take this opportunity, therefore, to demand that immediately collectible funds be furnished us at once or the original items inclosed in these remittance letters be returned to us with proper protest. Owing to instructions under which these items are received by us we cannot permit you to delay payment for any reason whatsoever, and unless immediate satisfaction is received as above, it will be necessary for us to make arrangements for presenting your items at your counter and demand payment therefor in cash. It is apparent that we should sincerely regret the necessity of an action of this nature, nevertheless under the circumstances as above mentioned, we feel that this would be our only recourse.

"Please give this matter your immediate attention."

On April 1, 1921, the defendant wired the Williston bank:

"We demand immediate payment or return items referred to in our telegram yesterday."

On March 31, 1921, the Williston bank wrote inclosing draft on Merchants National Bank of St. Paul, for $8,619.02, dated March 24, 1921. It stated that it had been held on account of a depleted reserve; that its president was in the cities making arrangements to replete the reserve; and that it had every reason to believe he would succeed. It was received by the defendant on Saturday, April 2, 1921, after clearance hours. Regularly it would not be given attention until the next business day. The Williston bank was overdrawn at the Merchants National Bank and had been since March 26, 1921. Its overdrafts increased. On March 22 it had in its bank money equal in amount to substantially one-half of the checks. It had in currency and accounts in other banks enough to pay both checks. The defendant ascertained that the draft was not likely to be paid. The letter of transmittal was not encouraging. The next business day was Monday, April 4, 1921. On that day the Williston bank closed. The draft was formally presented and protested on April 7, 1921.

On April 4, 1921, defendant wired the Williston bank as follows:

"Draft on Merchants totalling over ten thousand. Insufficient funds. Telegraph at once."

On April 4 or 5, 1921, the defendant telegraphed the Corn Exchange bank that checks 'had not been paid, that it held draft covering them, and that the bank was reported closed.

The defendant charged back the checks to the Federal Reserve Bank of Chicago. That bank charged the account of the Corn Exchange bank. That bank charged the account of the plaintiff. The plaintiff did not acquiesce until December 28, 1921, when, under the ruling of the comptroller of the currency, it credited the Corn Exchange and charged to undivided profits.

Section 11 of the federal reserve act of December 23, 1913, provides that the federal reserve "board shall perform the duties, functions, or services specified in this chapter, and make all rules and regulations necessary to enable said board effectively to perform the same." 38 St. 262, c. 6, § 11(i), 12 USCA, c. 3, § 248(i), p. 318.

Section 13 of the act, 38 St. 263, c. 6, § 13, 40 St. 234, c. 32, § 4, 12 USCA, c. 3, § 342, p. 334, provides in part:

"Any Federal reserve bank may receive from any of its member banks, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation, and also, for collection, maturing notes and bills; or, solely for purposes of exchange or of collection, may receive from other Federal reserve banks deposits of current funds in lawful money, national bank notes, or checks upon other Federal reserve banks, and checks and drafts, payable upon presentation within its district, and maturing notes and bills payable within its district; or, solely for the purposes of exchange or of collection, may receive from any nonmember bank or trust company deposits of current funds in lawful money, national-bank notes, Federal reserve notes, checks, and drafts payable upon presentation, or maturing notes and bills."

Referring to § 13, and certain provisions of regulation J, series 1917, in a case having some features similar to this, the court said in Transcontinental Oil Co. v. Federal Res. Bank, 172 Minn. 58, 60, 214 N. W. 918, 919, 61 A. L. R. 474:

"Member banks of the federal reserve banks send their items for clearance and collections to the reserve bank of which they are members; but to save time and work there existed an arrangement, in August, 1920, between the First National Bank of Chicago, the Federal Reserve Bank of Chicago, and the defendant whereby the former might send direct to defendant for collection items upon banks within its district, the proceeds of such items so routed being credited by defendant to the Federal Reserve Bank of Chicago, it being agreed by and between all these banks that their rights and liabilities should in all respects be the same as if items so routed had been first deposited by the First National Bank of Chicago with the Federal Reserve Bank there and by the latter deposited for collection with defendant."

In Pascagoula Nat. Bank v. Federal Res. Bank (D. C.) 3 F. (2d) 465, 468, the court, referring to § 13, said:

"A check sent by a member bank by the authority and for the account of its reserve bank is in effect received from the latter."

The court found that the checks were received directly from the Corn Exchange bank pursuant to an arrangement between the Federal Reserve Bank of Chicago, the Corn Exchange bank, and the defendant, whereby it was understood that the Corn Exchange might route its checks direct to the Federal Reserve Bank of Minneapolis instead of putting them through the Federal Reserve Bank at Chicago. The direct evidence of this is meager. There was some correspondence suggesting such arrangement. It was in harmony with regulation J, series 1920, which provided:

"Each Federal Reserve Bank will receive at par from other Federal Reserve Banks, and from all member and nonmember clearing banks, regardless of their location, for the credit of their accounts with their respective Federal Reserve Banks, checks drawn upon

all member and nonmember clearing banks of its district and upon all other nonmember banks of its district whose checks are collected at par by the Federal Reserve Bank."

The substance of the finding is sustained. In this connection the amended finding requested by the plaintiff is noted:

"That at the time said checks of plaintiff were received by said Corn Exchange National Bank, and at the time of all transactions involved in this action it was the law of the State of Illinois, in which state said Corn Exchange National Bank was situated and where it received said checks of plaintiff for deposit; that a bank in which checks drawn on a bank in a distant city, are deposited for collection and credit and indorsed by the depositor: 'Pay to the order of any bank or banker,' becomes the agent of the depositor to collect such checks, and that any bank to which said checks are forwarded for collection by the bank in which they were first deposited, becomes likewise in turn the agent of the depositor for purposes of collection; and is accountable to such depositor for all breaches of duty and obligation on its part that may occur. That this is true, even though the bank in which said checks are first deposited permits the depositor to draw against such checks before they are actually collected."

Section 16 of the act, 38 St. 265, c. 6, § 16, 12 USCA, c. 3, § 248(m), p. 320, provides:

"The Federal Reserve Board shall make and promulgate from time to time regulations governing the transfer of funds and charges therefor among Federal reserve banks and their branches, and may at its discretion exercise the functions of a clearing house for such Federal reserve banks, or may designate a Federal reserve bank to exercise such functions, and may also require each such bank to exercise the functions of a clearing house for its member banks."

Regulation J, series 1920, provides:

"In handling items for member * * * banks, a Federal Reserve Bank will act as agent only. The Board will require that

each member * * * bank authorize its Federal Reserve Bank to send checks for collection to banks on which checks are drawn, and, except for negligence, such Federal Reserve Bank will assume no liability. * * * Each Federal Reserve Bank will also promulgate rules and regulations governing the details of its operations as a clearing house, such rules and regulations to be binding upon all member * * * banks which are clearing through the Federal Reserve Bank."

The defendant bank, responding to this regulation, provided by circular 228(2, 6), effective in November, 1920, as follows:

"Checks received by the Federal Reserve Bank drawn on its member banks will be forwarded direct to such member banks and are to be remitted for by the member banks on day of receipt if possible, by their draft on the Federal Reserve Bank, provided they have a balance in excess of their required reserve, or by their draft on a bank in Minneapolis or St. Paul. Member banks are required by the Federal Reserve Board to provide funds ·to cover at par all checks received from their Federal Reserve Bank.

*　　*　　*　　*　　*

"In handling items for member banks, the Federal Reserve Bank of Minneapolis acts as agent only. It is understood that each member bank authorizes it to send checks for collection direct to banks on which checks are drawn, and except for negligence the Federal Reserve Bank of Minneapolis assumes no liability until funds are actually in its hands, and is authorized to charge back any item for which it has not received final payment, including items lost in transit."

This circular was sent to the Corn Exchange bank. There is evidence that it was not received. It was not sent to the plaintiff. It was sent to the Federal Reserve Bank at Chicago. As noted before, there was an arrangement between the Corn Exchange bank and the defendant that the Corn Exchange might route its checks directly to the defendant. It was bound by the terms of regulation J and circular 228. In Fergus County v. Federal Res. Bank,

75 Mont. 582, 244 P. 883, 886, a case much the same on its facts, there was involved circular 286, later and more definite than circular 228. The court said of it [75 Mont. 587]:

"Circular 286 constituted a continuing offer by this defendant to perform the services of a collecting agent for the Lewistown bank upon the conditions therein expressed, (1) that defendant might send the items for collection directly to the bank upon which they were drawn, and (2) that it might receive 'payment in cash or bank draft.' "

And under section 228 quoted above, providing that checks may be sent directly to the payor bank and that except for negligence the defendant assumes no liability until funds are actually in its hands, and that it may charge back any items for which it has not received payment, there is no liability, except for negligence, in taking payment by draft.

We see nothing in the regulation or the circular which limits the right of sending direct to the payor bank whether it is a federal reserve bank, or member bank, or nonmember bank. It is true that a member bank is required to keep a definitely determined deposit with the reserve bank. This is not made the basis of a distinction. When an item comes to the reserve bank to be presented to a state bank or nonmember bank, it can be sent direct and payment received in exchange. It is not a requirement that in one case exchange may be taken and in the other the payment must be in currency.

The plaintiff claims that it can recover because the defendant sent the two checks directly to the Williston bank; and because it did not make collection in currency; and in any event that it was negligent in doing as it did on and after March 17, 1921.

The cases are numerous and diverse in their facts and in the applicable local law or the contract of the parties and are confusing.

In Federal Res. Bank v. Malloy, 264 U. S. 160, 44 S. Ct. 296, 297, 68 L. ed. 617, 31 A. L. R. 1261, it was held that the authority under regulation J, series 1920, to send direct to the payor bank did not

include authority to accept a draft in payment; that, if a bank responsible to the payee of the check for collection surrendered the check to the drawee bank and accepted in payment an exchange draft which proved worthless, the collecting bank was liable to the payee of the check; and the court said that regulation J, series 1920, while it contemplated the sending of checks for collection directly to the payor bank, did not expressly permit the acceptance of payment other than in money; and that such authority could not be inferred from the authority to send directly to the payor bank. The court however said [264 U. S. 164]:

"The state decisions in respect of the liability of a correspondent bank to the owner of a check forwarded for collection by the initial bank of deposit are in conflict beyond the possibility of reconciliation. A number of states, following the 'New York rule,' so-called, have held that there is no such direct liability, but that the initial bank alone is responsible to the owner. On the other hand, an equal, if not a greater, number of states following the 'Massachusetts rule,' have held exactly the contrary, viz: that the initial bank by the mere fact of deposit for collection, is authorized to employ subagents, who thereupon become the agents of the owner and directly responsible to him for their defaults. This court, in Exchange National Bank v. Third National Bank, 112 U. S. 276, 5 S. Ct. 141, 28 L. ed. 722, after reviewing the two lines of decisions, approved the 'New York rule.' But the rule may, of course, be varied by contract, express or implied. Here the relations of the drawee to the initial bank of deposit are controlled by the Florida statute with respect to which it must be presumed they dealt with each other. This statute had the effect of importing the 'Massachusetts rule' into the contract, with the result that the initial bank had implied authority to intrust the collection of the check to a subagent and that subagent, in turn, to another; and the risk of any default or neglect on their part rested upon the owners."

In Exchange Nat. Bank v. Third Nat. Bank, 112 U. S. 276, at page 289, 5 S. Ct. 141, 147, 28 L. ed. 722, which adopted the so-called New York rule in preference to the Massachusetts rule, the court said:

"And, while the rule of law is thus general, the liability of the bank may be varied by consent, or the bank may refuse to undertake the collection. It may agree to receive the paper only for transmission to its correspondent, and thus make a different contract, and become responsible only for good faith and due discretion in the choice of an agent."

In City of Douglas v. Federal Res. Bank, 271 U. S. 489, 491, 46 S. Ct. 554, 555, 70 L. ed. 1051, the difference between the Massachusetts rule and the New York rule is stated as follows:

"Both plaintiff and defendant concede that it is the rule of the federal courts that a bank which receives commercial paper for collection is not only bound to use due care itself, but is responsible to its customer for a failure to collect, resulting from the negligence or insolvency of any bank to which it transmits the check for collection. This is the so-called 'New York rule,' which in effect makes the first bank a guarantor of the solvency and diligence of the correspondents which it employs to effect the collection. Exchange Nat. Bank v. Third Nat. Bank, 112 U. S. 276, 5 S. Ct. 141, 28 L. ed. 722. And see Federal Reserve Bank v. Malloy, 264 U. S. 160, 164, 44 S. Ct. 296, 68 L. ed. 617, 31 A. L. R. 1261, for a comparison of this rule of liability with the 'Massachusetts rule' by which the initial bank is liable only for its failure to exercise due care in the selection of an agent to make the collection. Under the Massachusetts rule the agent selected becomes the agent of the owner of the paper, who may maintain an action directly against it for the negligent performance of its undertaking. See Federal Reserve Bank v. Malloy, supra, 164, 44 S. Ct. 296. Compare Bank of Washington v. Triplett, 1 Pet. 25, 7 L. ed. 37, where the undertaking of the initial bank was to transmit paper for collection."

We adopted the rule of the Malloy case in Hommerberg v. State Bank, 170 Minn. 15, 212 N. W. 16, and have followed it in others. Tobiason v. First State Bank, 173 Minn. 533, 217 N. W. 934; Holdingford Mill. Co. v. Hillman Farmers Co-op. Creamery, 181 Minn. 212, 231 N. W. 928. And see Streissguth v. National German-Am.

Bank, 43 Minn. 50, 44 N. W. 797, 7 L. R. A. 363, 19 A. S. R. 213; Semingson v. Stock Yards Nat. Bank, 162 Minn. 424, 203 N. W. 412. We note that the rule pronouncing liability when the transmitting bank sends directly to the payor bank or receives payment in the draft of the payor bank instead of in currency is abrogated in Minnesota by L. 1927, p. 214, c. 138, 2 Mason, 1927, § 7233-1; Schram v. Askegaard (D. C.) 34 F. (2d) 348. And so in North Dakota, L. 1925, p. 212, c. 170; L. 1927, p. 91, c. 92; State v. Bismarck Bank, 57 N. D. 52, 220 N. W. 636.

In the concurring opinions in the Hommerberg case, 170 Minn. 15, 212 N. W. 16, it was suggested that the result there reached, following the Malloy case, 264 U. S. 160, 44 S. Ct. 296, 68 L. ed. 617, 31 A. L. R. 1261, was logical but harsh; that its enforcement was impracticable and perilous; that it necessitated every bank entering into contractual relations with its customers and correspondents to avoid its effect and attendant loss; and that the rule was out of harmony with modern banking practice. This may have suggested our statute.

We hold that the plaintiff was bound by regulation J, series 1920, and circular 228, both of which were effective when the transaction was had in March, 1921. The parties assented to the defendant bank's transmitting the plaintiff's check just as it did, that is, directly to the payor bank; and it assented to payment by the payor's draft. It is at once seen that if the rule obtained that currency must be sent, and it always was observed, the business of convenient exchange the country over would be paralyzed. The outside districts would be drained of their currency. The banks do not and cannot keep currency on hand to meet all paper demands. This fact made easy the establishment of a par of exchange. Cleve v. Craven Chemical Co. (C. C. A.) 18 F. (2d) 711, 52 A. L. R. 980. The purpose of a clearance system is to prevent the use of actual currency. And in this connection the following finding of the court made upon sufficient evidence is noted:

"That during all of March and April, 1921, and prior thereto, it was the established, general, uniform and certain usage and custom

among banking institutions in Minnesota and North Dakota, where checks deposited for collection drawn on banks located at a distance had been forwarded direct to the drawee or payor bank for collection, for the drawee or payor bank to remit the proceeds of the collection in exchange drafts drawn on banks in the vicinity of the forwarding bank, and it was the established, general, uniform and certain usage and custom among banking institutions in said states for the forwarding bank to permit such remittance by draft, and upon receipt of the exchange or remittance drafts to endeavor to collect the same."

The presence of such a custom distinguishes one feature of the Malloy case, 264 U. S. 160, 44 S. Ct. 296, 68 L. ed. 617, 31 A. L. R. 1261. Hicks Co. Ltd. v. Federal Res. Bank, 174 Ark. 587, 296 S. W. 46; Spokane Valley State Bank v. Lutes, 133 Wash. 66, 233 P. 308. It is held that the defendant dealt with the checks as it was intended that it should and that it was not liable unless it was negligent.

■ The plaintiff claims that the defendant was negligent in sending the checks to the payor bank at Williston for collection and in taking payment by its draft instead of demanding currency. The bank was in good repute. It was on the par list of the defendant. It had been doing business with the defendant for two months, and their relations were satisfactory. The other state bank at Williston was in doubtful condition. The national bank located there had not been satisfactory in its dealings with the plaintiff and did not want the exchange business. The bank situation in North Dakota at the time was not good. Five per cent of the banks had failed, 40 out of 800; but in what sections of the state and at what times does not appear. Business had to be done, debts paid, money transmitted, and the business of exchange had to go on. A bad banking condition ought to make forwarding banks wary. The transaction of March, 1921, was not an unusual transaction or an infrequent one though the two checks were of considerable amounts. The evidence shows that the daily transactions through the bank by way of checks and drafts amounted to as much as $10,000,000

to $15,000,000; that there were as many as 75,000 to 85,000 checks or drafts handled each day; and that they were drawn on 3,000 banks. These figures may exaggerate the situation, but they are of some value.

It is urged that the defendant should have been more active after March 22, 1921, when the remittance was due and none came. The effort it exercised has been narrated. The Williston bank, if it could not pay, should have had the checks presented and protested. It assumed to pay, charged the county treasurer, but did not transmit. It misrepresented the facts to the defendant bank, to which it should have remitted or whose command for protest it should have observed. Evidently the bank was in trouble and was trying to save itself and its depositors and creditors. It failed and is to be blamed. It was in the position of a collecting bank and also payor bank. It failed in its duties as a collecting bank. It put the checks out of its possession. If they had been dishonored and put in the way of return to the county treasurer with a demand for the debt which they had not paid, the original liability of the county would have been preserved. This was a fault of the Williston bank. It was not the intention of the parties that the defendant itself should present the checks at the counter. It was to forward them.

The defendant did not obey the instruction to wire nonpayment. The transit schedule, going and returning, was four business days. A Sunday intervened. This extended the period to March 22, 1921. It notified the Corn Exchange bank on March 24 and again on March 30. It was trying to get payment, and the Williston bank was trying to make payment. The latter did not refuse payment or assume to dishonor the checks. The defendant did not have actual knowledge until April 2, 1921, after clearance hours, that payment would not be made. A finding of negligence for failure to wire was not required.

It is urged further that the defendant was at fault in respect of the Williston bank draft on the Merchants National, which was sent on March 31, 1921, and which reached the defendant on April 2, 1921. Its sending was pretty much a sham. When sent the

Williston bank had an overdraft of $10,000. It continued until it closed its doors. It had had an overdraft since March 26. Protest was useless. It was not necessary to the fixing of the liability of the Williston bank. It was a neglect or misuse of the two checks which brought the trouble, and that was days prior to the Merchants draft, and, as found by the trial court, was not the fault of the defendant. Whether there might have been something done immediately after the wrong of the Williston bank to restore the checks to the plaintiff so that it might fix liability upon the treasurer, or whether the misdealing with the checks gave it a preference upon the theory of a trust, is not of concern here.

The defendant urges that it should have consideration because it was rendering an uncompensated service. We do not agree. It was charged with definite duties. It is given definite rights and privileges of great consequence by the statute of its organization. It was to do a banking business of a particular character and was given extensive powers. It was required to give free exchange. It was not doing a free service, though there was no specific charge for this incidental one.

The court finds:

"That until April 2, 1921, defendant had no knowledge or notice of the unsafe condition of said Williston State Bank and that defendant in handling said checks for $6,420 and $2,022.30 for collection was not negligent in any particular."

This finding is sustained by the evidence.

Judgment affirmed.