Nancy M. Jones, Plaintiff, *v.* Board of Education of Union Free School District No. 1 of the Town of Pelham, Defendant.

Second Department, May 18, 1934.

18

*J. Lester Albertson*, for the plaintiff.

*Pike P. Waldrop*, for the defendant.

LAZANSKY, P. J. Plaintiff, a resident of the city of New Rochelle, in Westchester county, is a teacher in a school maintained by defendant in the town of Pelham in that county and adjoining the city of New Rochelle. On February 28, 1933, a representative of defendant delivered to plaintiff a check of defendant in the sum of $290.80, to her order, drawn on the Pelham National Bank, a Federal banking association in the town of Pelham. The bank was open for business on Friday, March 3, 1933, until three P. M., the regular closing time. All checks duly presented by holders in person at or before three P. M. on that day were paid. At all times up to the close of business on Friday, March 3, 1933, the Pelham National Bank had sufficient cash on hand to pay all outstanding checks of defendant, including the one issued to plaintiff, and defendant had on deposit with the Pelham National Bank, to its credit, funds sufficient to pay all its outstanding checks, including that of plaintiff. On Saturday, March 4, 1933, a bank holiday was declared by the Governor of New York State. The Pelham National Bank did not open for business on that day, and at no

time since has it opened for business. It has been declared insolvent as of the close of business on Friday, March 3, 1933. A conservator was appointed by the Comptroller of the Currency of the United States, and thereafter a receiver was appointed by the same authority. The receiver has since been in charge. Plaintiff had no account in the Pelham National Bank, but had one in the New Rochelle Trust Company in the city of New Rochelle. During the afternoon of February 28, 1933, in the forenoon of which plaintiff received the check, she indorsed it and mailed it to the New Rochelle Trust Company " for deposit " to her account. It was received by the New Rochelle Trust Company on March 1, 1933. Upon receipt of the check, that company, in accordance with its custom, mailed it to its correspondent, the Bankers Trust Company in New York city, a member of the Federal Reserve System, by which it was received on March 2, 1933. The Bankers Trust Company indorsed the check and sent it to the Federal Reserve Bank of New York for collection. On that day, March 2, 1933, the Federal Reserve Bank mailed the check to the drawee, the Pelham National Bank. On Friday, March 3, 1933, before the close of business, the check was received by the Pelham National Bank, perforated " Paid 3–3–33," and charged to the account of defendant. In the afternoon of the same day — whether prior to or after the close of business does not appear — the Pelham National Bank drew and mailed a draft on the Federal Reserve Bank for the total amount of checks received by it on that day from the Federal Reserve Bank, including that of plaintiff, which the Pelham National Bank wished to honor. That draft was an overdraft. The Pelham National Bank did not have to its credit with the Federal Reserve Bank funds sufficient to meet the payment thereof. As a conse- quence of that and of the bank holiday and the insolvency of the Pelham National Bank, the draft, when received, was dishonored. As heretofore stated, a conservator of the assets of the Pelham National Bank was appointed by the Comptroller of the Currency of the United States, and thereafter, by like authority, a receiver was appointed. On or about March 30, 1933, defendant learned, through a conversation between its representative and a representa- tive of the conservator, that defendant's check to the order of plaintiff had been ordered by the Comptroller of the Currency to be returned to the bank of deposit through the collecting banks used in presenting it. Such check was returned to the Federal Reserve Bank, and eventually to the New Rochelle Trust Company, and was received by the latter on or about April 6, 1933, and charged back to plaintiff's account. Plaintiff received notice of the fore- going facts from the New Rochelle Trust Company in the afternoon

of Friday, April 7, 1933, and on Monday, April 10, 1933, orally notified an agent of defendant that her check had been returned and charged back, as aforesaid. Defendant's check was not protested, and no written notice of dishonor was given to defendant. Upon these facts, and others which do not require consideration, the following claims are made:

1. Plaintiff claims that she is entitled to judgment against defendant for the amount of her salary, $290.80, with interest from February 28, 1933, with costs.

2. Defendant claims that it has paid its obligation to plaintiff for the salary; that plaintiff did not present the check to the drawee within a reasonable time, and that defendant is, therefore, entitled to judgment dismissing the claim.

In this statement of specific claims made by defendant it is not urged that defendant has been relieved of responsibility by reason of a failure to give due notice of dishonor. However, it was agreed, by the submission, that the court should render such judgment as shall be proper on the submitted facts, and, therefore, the matter of failure to give due notice of dishonor should be considered.

Was defendant's check paid? By article 19-A of the Negotiable Instruments Law (added by Laws of 1929, chap. 589) the Legislature adopted what is commonly called the "Bank Collection Code." Prior to that time there had been innumerable and conflicting decisions in the State and Federal courts on various phases of the collection of checks by banks. One of the incidents of collection, on which much has been written, is that of payment by the drawee bank of checks sent to it by mail. May a check of the drawee bank be taken in payment of a check drawn on the drawee? If so, and the drawee's check is dishonored, where does the loss fall? Is a bank collecting agent authorized to accept from the drawee payment other than in currency? Is the drawee an agent for collection, as well as payor? Is the depository bank a collecting agent or a purchaser? What act of the drawee constitutes payment? At what time is payment made? When the drawee bank charges a check item against the maker, is a trust fund established for the benefit of the holder? These and other questions have been given much consideration. (*Baldwin's Bank* v. *Smith*, 215 N. Y. 76 [which discusses *Indig* v. *National City Bank*, 80 id. 100 and *Burkhalter* v. *Second National Bank*, 42 id. 538]; *Smith* v. *Miller*, 43 id. 171; 52 id. 545; *Turner* v. *Bank of Fox Lake*, 3 Keyes, 425; *People* v. *Merchants & Mechanics' Bank*, 78 N. Y. 269; *McIntosh* v. *Tyler*, 47 Hun, 99; *Federal Reserve Bank* v. *Malloy*, 264 U. S. 160; *City of Douglas* v. *Federal Reserve Bank*, 271 id. 489; *Nineteenth Ward Bank* v. *South Weymouth Bank*, 184 Mass. 49; 2 Paton's Digest,

p. 1496 *et seq.;* Prof. Roscoe B. Turner, Bank Collections, 39 Yale Law Journal, 468; Prof. Wayne L. Townsend, Tulane Law Review, vol. VIII, No. 1, p. 21; No. 2, p. 236.)

If the so-called majority rule were applicable to the facts in this case, and assuming that the Federal Reserve Bank sent the check to the Pelham National Bank for collection, the defendant would be absolved from responsibility upon either of two grounds: (1) That the collecting agent was without authority to receive the check of the Pelham National Bank, and that when it did so it assumed the risk of payment, or (2) when the check was marked paid by the Pelham National Bank and charged to the account of defendant, the obligation of defendant was transferred to the Pelham National Bank. (*Baldwin's Bank* v. *Smith, supra.*)

In view of the state of the law, effort was made to codify rules applicable to the collection of checks by banks. As a result of that effort, a number of States, including New York, adopted a uniform bank collection code. (See Laws of 1929, chap. 589.)

By section 350-c of chapter 589 of the Laws of 1929 it is provided that where an item is indorsed " for deposit," the depository bank, in this case the New Rochelle Trust Company, becomes an agent for collection. This item was received by the New Rochelle Trust Company " for deposit." Provisions of the act indicate that when an item is presented at the drawee bank it is for payment, and the collecting agent may receive in payment (§ 350-h), in lieu of money, either (a) the check or draft of the drawee or payor upon another bank, or (b) the check or draft of any other bank upon any bank other than the drawee or payor of the item; or (c) such method of settlement as may be customary in a local clearing house or between clearing banks or otherwise.

Section 350-f, which is of extreme importance here, provides: " Items received through the mail. Where the item is received by mail by a solvent drawee or payor bank, it shall be deemed paid when the amount is finally charged to the account of the maker or drawer."

The language is clear and no doubt is left as to its meaning. In this case the defendant's check, when received by the Pelham National Bank, was marked " paid " and charged to the account of defendant. It must be assumed that at that time the Pelham National Bank was solvent. Nothing to the contrary appears in the submission. It does appear that at three o'clock, after the item had been charged to defendant, the Pelham National Bank was insolvent. This section is a restatement of the rule laid down in those adjudications which held that the drawee was a collecting agent as well as a payor, and when it performed any

act which amounted to an appropriation of the credit of the maker to the credit of the collecting agent, that was payment and the maker was released. By the section, whether the check is presented by the collecting agent for collection or payment, payment is effected by charging the amount of the check to the account of the maker. This act, commonly known as the Bank Collection Code, was drafted at the instance of the American Bankers' Association. In a note to section 350-f by the authors of the code (Brady, Uniform Negotiable Instruments Act, p. 109) it is suggested that the purpose of this section was to fix a definite point of time at which the item should be deemed paid to avoid trouble and litigation with intervening claimants to the maker's funds, as in case of death, bankruptcy, attachments, etc. The language of the section does not justify the suggested limitation. That view has not been accepted by writers who have discussed the section (Prof. Roscoe B. Turner, Bank Collections, 39 Yale Law Journal, 468; Prof. Wayne L. Townsend, Tulane Law Review, vol. VIII, No. 1, p. 21; No. 2, p. 236) nor by the National Conferences of Commissioners on Uniform State Laws and Proceedings, who have been laboring in the preparation of a similar code. (Hand Books, 1929–1932.)

The act itself indicates no such limitation. Section 350-j provides:

"§ 350-j. Election to treat as dishonored items presented by mail. Where an item is duly presented by mail to the drawee or payor, whether or not the same has been charged to the account of the maker or drawer thereof or returned to such maker or drawer, the agent collecting bank so presenting may, at its election, exercised with reasonable diligence, treat such item as dishonored by nonpayment and recourse may be had upon prior parties thereto in any of the following cases:

"(1) Where the check or draft of the drawee or payor bank upon another bank received in payment therefor shall not be paid in due course;

"(2) Where the drawee or payor bank shall without request or authority tender as payment its own check or draft upon itself or other instrument upon which it is primarily liable;

" 3. Where the drawee or payor bank shall give an unrequested or authorized credit therefor on its books or the books of another bank; or

"(4) Where the drawee or payor shall retain such item without remitting therefor on the day of receipt or on the day of maturity if payable otherwise than on demand and received by it prior to or on such day of maturity.

" Provided, however, that in any case where the drawee or payor bank shall return any such item unpaid not later than the day of receipt or of maturity as aforesaid in the exercise of its right to make payment only at its own counter, such item cannot be treated as dishonored by nonpayment and the delay caused thereby shall not relieve prior parties from liability.

" Provided further that no agent collecting bank shall be liable to the owner of an item where, in the exercise of ordinary care in the interest of such owner, it makes or does not make the election above provided or takes such steps as it may deem necessary in cases (2), (3) and (4) above."

The two sections together (350-f and 350-j) mean that where an item is charged to the account of the maker it is paid; but even in such case the agent collecting bank may elect with reasonable diligence to treat the item as dishonored for non-payment, and recourse may be had upon prior parties thereto in the four instances named. Item (4), section 350-j,. shows that there· may be an election to dishonor even where the drawee fails to remit to the collecting agent. This indicates ̇that it was intended to make section 350-f comprehensive enough to cover every case where a check is presented by mail to the drawee and is charged to the account of the maker. It makes no difference whether or not the drawee is a collecting agent as well as a payor. So, in the case at bar, defendant's check has been paid, and it is released from liability unless it can be found that an election to dishonor has been made with reasonable diligence (§ 350-j) and notice of dishonor given with reasonable diligence (§ 350-k).

The election to be made is either to hold the drawee because of non-payment of its check, or to dishonor and hold prior parties.

Section 350-j does not provide for a notice to be given to any one in case of an election. If such notice were required, it surely would be only to those against whom the election would be made, for they would be the only ones liable by virtue of the election. The check of the Pelham National Bank was drawn on the Federal Reserve Bank and, in my opinion, comes within the meaning of subdivision 1 of section 350-j. It is also my opinion ̇that since the Federal Reserve Bank was a sub-agent of plaintiff, plaintiff could make the election in place of its sub-agent (§ 350-a), the Federal Reserve Bank. The Pelham National Bank did not reopen its doors after the close of business at three P. M. on March 3, 1933. The Federal Reserve Bank took no action in the matter, as far as this record shows, until sometime in April, 1933. It may be that its officers were under the impression that it had a right of preference in the distribution of the assets of the Pelham

National Bank by virtue of section 350-l of the Negotiable Instruments Law, added by chapter 589 of the Laws of 1929. If they so believed, they were in error, because there are no preferences among creditors of a national bank. Its assets must be divided ratably among its creditors. (U. S. Code, tit. 12, § 194; *Davis* v. *Elmira Savings Bank*, 161 U. S. 275.)

On March 30, 1933, defendant knew that a conservator of the Pelham National Bank had been ordered by the Comptroller of the Currency to return defendant's check to the New Rochelle Trust Company through the other collecting agents, the Federal Reserve Bank and the Bankers Trust Company. Defendant's check was subsequently so returned to the Federal Reserve Bank, and, through the Bankers Trust Company, to the New Rochelle Trust Company, and was received by the latter on April 6, 1933, and charged back to plaintiff's account. The statement of facts does not disclose that a revocable credit was given by Bankers Trust Company to New Rochelle Trust Company or by Federal Reserve Bank to Bankers Trust Company (Neg. Inst. Law, § 350-a), although such credits were probably given under Federal Reserve Bank regulations (*Matter of Jayne & Mason*, 140 Misc. 822, 825), and it does not disclose a revocation of credit upon return of the item. By the return of the item, whether the Federal Reserve Bank had given a revocable credit or not, it withdrew itself from the situation. It had surrendered its rights to the check of defendant. It intended to shift or had shifted responsibility to prior parties. This was an election to dishonor the check. In *Matter of Jayne & Mason (supra)* Mr. Justice MARSH N. TAYLOR calls attention to the fact that the items had not been returned to forwarding agents and, therefore, the charging off of credits theretofore given, done under agreement pursuant to Federal Reserve Bank regulations, was not an election. The election here took place over a month after the Pelham National Bank's check had been dishonored. Because of bank holidays created by presidential proclamations, including March 9, 1933, it may be that the Federal Reserve Bank could make no election until March 10, 1933. If this was not an election, then, assuming plaintiff had the right of election where the collecting agent did not elect, plaintiff, by this submission asserting her claim for salary, has made such election. Under the circumstances of this case, it makes no difference if the election was exercised three weeks, one month or ten months after opportunity afforded. Section 350-j requires that the election be exercised with reasonable diligence. Reasonable diligence is not necessarily measured by time alone. It may depend upon circumstances and conditions affecting the situation. (Neg. Inst. Law,

§ 4.) If elections be delayed and delay causes no loss to a maker, then he should not be released. The check of the Pelham National Bank in payment of defendant's check was mailed by that bank to the Federal Reserve Bank on the afternoon of March 3, 1933. It could not have reached the Federal Reserve Bank until March fourth. At the close of business on March third, the Pelham National Bank closed its doors because of insolvency, and ever since has been in the hands of a conservator and a receiver appointed by the Comptroller of the Currency of the United States. It is a fair inference from the statement in the submission that whoever is entitled to any rights against the Pelham National Bank had, up to the time of the election by the Federal Reserve Bank (three or four weeks after the dishonor of the Pelham National Bank's check), the same rights that it had at the time the bank closed its doors, to wit, to a *pro rata* share of the proceeds of liquidation. The like would be true if the election had been made by plaintiff, by the execution of the submission, ten months after the check of the Pelham National Bank had been dishonored. Therefore, if this loss is to fall upon defendant, its rights have not been impaired in the slightest degree by delay in making the election. A month or ten months after the Pelham National Bank closed on March 3, 1933, defendant had, and still has, a right to share in the net assets of the Pelham National Bank, as it had when the bank suspended. Delay in electing has not been the cause of any loss to defendant. In this view, election has been exercised with reasonable diligence.

Section 350-k provides: " In case of the dishonor of an item duly presented by mail as provided for in the next preceding section, notice of dishonor of such item to prior parties shall be sufficient if given with reasonable diligence after such dishonor."

It is conceded that no written notice of dishonor was given. On March 30, 1933, defendant knew that its check was to be returned to plaintiff. On April 10, 1933, plaintiff notified defendant that its check had been returned to her and charged against her account with the New Rochelle Trust Company. This was sufficient notice of dishonor. (Neg. Inst. Law, § 167.)

This right of election to dishonor is anomalous. A check is paid under section 350-f, and yet may be dishonored if the check of the drawee bank is dishonored. Here, even assuming that the Federal Reserve Bank was open on March fourth, that was the earliest day on which notice of dishonor could be given by it if election to dishonor had likewise been exercised. In all likelihood, because of the bank holiday, March tenth was the earliest day. However, it appears that no notice of dishonor was given until April tenth.

Section 111 of the Negotiable Instruments Law provides that a drawer engages that on due presentment the instrument will be accepted and paid, and if dishonored, and necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder.

Section 160 of the Negotiable Instruments Law provides that any drawer or indorser to whom notice of dishonor is not given is discharged.

Section 173 provides: "Notice may be given as soon as the instrument is dishonored; and unless delay is excused as hereinafter provided, must be given within the times fixed by this chapter."

Sections 174 and 175 provide definite times within which notice of dishonor must be given.

If those sections were to be applied here, there can be no doubt that notice of dishonor was not duly given.

Section 185 provides: "Notice of dishonor is not required to be given to the drawer in either of the following cases: * * * 4. Where the drawer has no right to expect or require that the drawee or acceptor will honor the instrument."

The bank closed because of insolvency on March 3, 1933. Its assets then came under the direction of the Federal government. Defendant no longer had any control over the funds of the Pelham National Bank; its account with the bank was no longer subject to its order; it no longer had any right to require the money to be paid, nor had it the right to expect it to be paid.

This construction of the words "right to expect or require that the drawee or acceptor will honor the instrument" is broad and comprehensive, yet it seems to me to be a just and practical one, especially in the case of a maker of a check where no indorsers are involved. It should make no difference that the maker did not know of the situation. The common instances where it has been held that notice was unnecessary are where the maker had no funds in the bank, or knew that he did not have enough there to meet the check. Therefore, by his own act, he had "no right or reasonable ground to expect," because he was guilty of "fraud or folly." (2 Daniel Neg. Inst. [4th ed.] § 1073.) This, however, would not apply to an honest maker who had by real mistake overdrawn his account. It may be that subdivision 4 of section 185 of the Negotiable Instruments Law was drawn from the common-law rule, based upon the maker's own act. It seems to me, however, there is no substantial difference between the act of the maker which prevents payment, and the intervention of sovereign authority which likewise prevents payment. The precedent for this view may be found in *Lovett* v. *Cornwell* (6 Wend. 369). In 2 Daniel on

Negotiable Instruments ([4th ed. 1891], § 1171, and [7th ed. 1933], § 1342) a contrary view is indicated. The author says that bankruptcy and insolvency in the drawee of the bill, however well known, constitute no excuse for neglect to make due presentment or to give notice of dishonor to the drawee and indorser. The statement, in so far as presentment of a check is concerned, is not accurate if section 322 of the Negotiable Instruments Law be considered. This law was in existence when the seventh edition was published. It seems that the author did not mean to apply this rule with reference to bankruptcy and insolvency to the maker of a check, for in another part of both the fourth and seventh editions (§ 1587 in the former, and § 1772 in the latter) it is stated that there is an important distinction between bills and checks with respect to the consequence of neglect and delay in presentment and notice; that indorsers and drawers of bills of exchange are absolutely discharged, but the drawer of a check is regarded as the principal debtor and the check purports to be made upon a fund deposited to meet it; that the negligence of the holder in not making due presentment or not giving notice of dishonor does not absolutely discharge him from liability unless he has suffered some loss or injury from such negligence, and then only to the extent of such loss or injury; that at most he is entitled to such presentment or notice as will save him from loss; that were it otherwise " the drawer would profit by a neglect which could do him no injury." As will be shown later, this was the rule before the enactment of the Negotiable Instruments Law. My conclusion is that, under section 185, subdivision 4, of the Negotiable Instruments Law, it was not necessary to give notice of dishonor.

However, a notice of dishonor was given when plaintiff, on April 10, 1933, notified defendant that its check had been returned by the New Rochelle Trust Company and that her account had been charged therewith. (Neg. Inst. Law, § 167.) Assuming that the election to dishonor was made early in April by the Federal Reserve Bank, several days elapsed between the election and notice. If sections 173 to 175 of the Negotiable Instruments Law were to be applied, then the notice was not timely. But section 350-k requires only reasonable diligence in giving notice of dishonor. Was the notice given with reasonable diligence? Assume the notice of dishonor was not given until plaintiff elected to sue defendant for her salary by way of this submission, was that reasonable diligence? The purpose of giving prompt notice of dishonor is to enable a party to be charged to preserve and protect his rights against prior parties. (*Cady* v. *Bradshaw*, 116 N. Y. 188.) Here, again, reasonable diligence should not be

measured by time alone, but by the effect delayed action may have in the case of a check upon the maker. If he receive notice at a time when his position is no worse than it was when due notice may have been given, how is he hurt? If the delayed notice has caused him no possible loss, why should he be discharged? This question has already been considered in connection with "reasonable diligence" in the exercise of election to dishonor. Defendant's only recourse was to the Pelham National Bank. It has been closed since March 3, 1933. Defendant's rights against it were then fixed, and have not changed since. From March 3, 1933, up to the time of the election and up to the time of the execution of this submission, defendant's rights against the Pelham National Bank have been the same. There was no action that it could have taken during that period which would make its position better than it was when the bank closed business on March 3, 1933. Under these circumstances, it seems to me that notice of dishonor was given with reasonable diligence.

Prior to the enactment of the Negotiable Instruments Law, where the omission of demand and notice did not operate to the injury of the indorser of a note, he was not discharged. But such injury was presumed until the plaintiff by proof removed all chance of damage. (*O'Bannon Co.* v. *Curran*, 129 App. Div. 90; *Hayward* v. *Empire State Sugar Co.*, 105 id. 21, citing *Commercial Bank of Albany* v. *Hughes*, 17 Wend. 94; *Smith* v. *Miller*, 43 N. Y. 171.)

It has been noted that, under section 350-k, notice of dishonor must be given with reasonable diligence after such dishonor, while under sections 173 to 175 notice is required to be given within definitely fixed times. The Legislature, therefore, must have intended by "reasonable diligence" to fix a time dependent upon all the circumstances and conditions of the situation, and, may be, had in mind that under the common-law rule "reasonable diligence" was exercised when the notice was given in time so as not to impair any of the rights of the party to be charged.

Soon after the Negotiable Instruments Law was adopted, questions arose as to sections 160 and 322 of the law. By the former, the drawer is discharged if due notice of dishonor is not given; by the latter, the maker of a check is discharged only to the extent of loss if due presentment is not made. Professor Ames of Harvard said that the rule in case of notice of dishonor was obviously undesirable. (14 Harvard Law Review [1900–1901], at p. 256.) Commenting on the article by Dean Ames, Judge Brewster, in 15 Harvard Law Review, 35, suggested that the courts would recognize the distinction between bills of exchange and checks and hold that as to checks the two sections had the same meaning

under the Negotiable Instruments Law as under the common law, and that, in case of failure to give notice of non-payment, the maker would not be discharged further than to the extent of the loss occasioned by delay. It is also suggested that if there was a right of action by loss on the check, the drawer or maker would be liable on the original debt. In view of the rule prior to the enactment of the Negotiable Instruments Law, which is a codification of the Law Merchant (*Commercial Nat. Bank* v. *Zimmerman*, 185 N. Y. 210), it seems to me that it would be in accord with past experiences and a fair practical construction of the two sections to deny release to the maker of a check, who has not received notice of dishonor, when no injury could possibly result. No case has been disclosed since the enactment of the Negotiable Instruments Law which squarely holds to that effect. *Bacigalupo* v. *Parrilli* (112 N. Y. Supp. 1040) is not to the contrary. It is not necessary to decide the question.

It is claimed that the check was not duly presented for payment. If the facts here were considered unaffected by the provisions of chapter 589 of the Laws of 1929, it could be demonstrated that the check was duly presented for payment. (*Zaloom* v. *Ganim*, 72 Misc. 36.) The same conclusion could be reached in view of the procedure for collections authorized by sections 350-a, 350-d and 350-e of the Negotiable Instruments Law, added by chapter 589 of the Laws of 1929. But it will be unnecessary to proceed in either direction. Under section 350-f, this check was paid. Defendant admits that it was paid. Surely, if the check was paid, there was due presentment for payment. True, it was afterwards dishonored under section 350-j, but that does not affect the due presentment.

My conclusions are: (1) The check was paid; therefore, there was due presentment. (2) There was an election to dishonor, exercised with reasonable diligence. (3) Defendant was not released from its obligation to plaintiff: (a) Notice of dishonor was not required under section 185, subdivision 4, of the Negotiable Instruments Law; (b) notice of dishonor was given with reasonable diligence. (See Neg. Inst. Law, § 350-k.)

Judgment should be directed for plaintiff for the amount of her salary, with interest from February 28, 1933, with costs.

Present — LAZANSKY, P. J., KAPPER, HAGARTY, CARSWELL and SCUDDER, JJ.

On the submission of the controversy under sections 546 to 548 of the Civil Practice Act, judgment is unanimously directed for plaintiff for the sum of $290.80, with interest from February 28, 1933, with costs.