In the Matter of the Liquidation of the STATE BANK OF BINGHAMTON.

Supreme Court, Broome County, July 7, 1934.

*Hinman, Howard & Kattell* [*George L. Hinman* of counsel], for the petitioner.

*Walter S. Logan* [*Jenkins, Deyo & Hitchcock* of counsel], for the Federal Reserve Bank of New York.

*Root, Clark, Buckner & Ballantine* [*H. H. Breland* of counsel], for Dillon, Read & Co.

PERSONIUS, J. Separate petitions were presented with notices of motion returnable in Broome county July 7, 1933. The matters were continued and finally submitted November thirteenth.

Two preferred claims are involved, one presented by the Federal Reserve Bank of New York, and the other by Dillon, Read & Co. Each motion is for instructions; each petition asks that the claimant be denied priority.

The State Bank of Binghamton, hereinafter called State Bank, was open until the close of business Saturday, December 13, 1930, but failed to open Monday morning, December fifteenth. The petitioner then took charge. On Thursday, December eleventh, the Federal Reserve Bank of New York, hereinafter called Federal Reserve, had for collection seventy-one items drawn on State Bank aggregating $56,094.13. They were mailed to State Bank and received by it December 12, 1930. On Friday, December twelfth, the Federal Reserve had for collection forty-eight items drawn on State Bank aggregating $27,064.56. These likewise were mailed to State Bank and received by it December 13, 1930. Of these one hundred and nineteen items, one hundred and one were checks drawn by customers of State Bank and aggregated $36,591.80, while eighteen, aggregating $46,566.89, were cashiers' checks drawn by State Bank upon itself. Upon receipt State Bank charged each item to the respective drawers thereof. Such charges have never been reversed and the items remain with the Superintendent of Banks.

On Saturday, December thirteenth, the State Bank mailed to Federal Reserve two drafts, one covering the items received Friday, December twelfth, and the other the items received Saturday, December thirteenth, drawn on the Irving Trust Company of New York. The drafts were presented December fifteenth. Payment was refused.

Among the items forwarded December eleventh was a cashier's check of the State Bank, dated December ninth, payable to Dillon, Read & Co., for $30,350, issued to pay for bonds purchased November 20, 1930. This item was deposited by Dillon, Read & Co. with Chemical Bank and Trust Company and by it delivered to Federal Reserve for collection. Dillon, Read & Co., as owner, filed its claim thereon about January 10, 1931, and claimed preference.

Petitioner had given notice to present claims by June 2, 1931. About May nineteenth Federal Reserve as agent filed a claim for preference on ninety-nine of the one hundred nineteen items so forwarded by it. About August 24, 1931, Federal Reserve amended this claim. Dillon, Read & Co. and others having filed claims direct on some of these items, Federal Reserve by instruments dated June 1, 1933, and July 21, 1933, withdrew from its claim forty-two items so filed on by others, leaving its claim for preference $30,027.61. Petitioner claims that among the fifty-seven items remaining in Federal Reserve's claim, six items, aggregating $27,779.21, have been filed on by the drawers in their own behalf.

Respondents' claim to preference is based on subdivision 2 of section 350-l of article 19-A. (All statutory references are to the

Negotiable Instruments Law unless otherwise specified.) That article was adopted in 1929.* The decision here depends somewhat on its construction. Therefore, the purpose of its enactment is important.

Prior to 1929 there had been innumerable and conflicting decisions in the State and Federal courts on various phases of the rights and liabilities growing out of the collection of checks by banks, particularly where the item was presented and remitted for by mail. To point out one conflict of authority (because it is particularly referred to by counsel), some States adopted the so-called " trust doctrine;" others, including New York, rejected it. In substance the doctrine was that when a bank received an item drawn on it, stamped it paid and charged it to the drawer, it thereby appropriated a fund from the drawer's deposit which fund it held in trust to transmit and the owner, the beneficiary of that trust, was entitled to enforce it and thereby obtain preference. In most States a necessary element of that doctrine was that the drawee bank have on hand and on deposit in other banks an amount equal to the item or items which it stamped paid. In other words, it was necessary that there be a *res* consisting of cash to which the trust could attach. There were other conflicting rules in the various jurisdictions. Another rule considered unfair was that if a collecting bank accepted payment in other than cash, that is, if it presented an item by mail which was paid by draft which was dishonored, the collecting bank was liable. Modern banking practice seemed to necessitate presentment by mail and remittance by draft or the like. Therefore, the trend has been to legalize and not penalize such practice.

In view of the conflicting and unsatisfactory state of the law, effort was made to codify rules applicable to the collection of checks by banks. A code, referred to as the " Collection Code," was formulated by the American Bankers Association. *Uniformity was sought.* To accomplish this and to adjust the law to modern banking practices of presenting and paying items by mail, this Code was drafted and its adoption urged on the various State Legislatures. About twenty States have adopted it in substance. New York State did so by enacting article 19-A.

Section 350-a provides that where an item is deposited for collection, the bank of deposit is the agent of the depositor and each subsequent collecting bank is a subagent; and " *any credit given by any such agent or subagent bank therefor shall be revocable until such time as the proceeds are received in actual money or an unconditional credit given on the books of another bank.*"

---

*See Laws of 1929, chap. 589, adding article 19-A to Negotiable Instruments Law.

Section 350-j provides (in cases like the present) that where an item is presented by mail, whether or not it is charged to the maker's account or returned, " the agent collecting bank so presenting may, at its *election* * * * treat such item as dishonored by non-payment and recourse may be had upon prior parties." In other words, where an item is presented by mail to the bank on which it is drawn and charged to the maker's account and retained by the drawee bank, the collecting bank, as the owner's agent, may elect to treat it as dishonored and thereby hold prior parties. This right is obtained only by such election. If such election is not made, section 350-l subdivision 2, applies.

Section 350-l, subdivision 2, provides in substance that if the election to treat the item as dishonored is *not* made, and the bank had " on deposit to the credit of the maker or drawer an amount equal to such item or items " and the bank closes " after having charged such item or items to the account of the maker * * * but without such item or items having been paid or settled for " by the closed bank " either in money or by an unconditional credit * * * the *assets* of such drawee or payor [closed bank] shall be impressed with a *trust* in favor of the owner or owners of such item for the amount thereof * * * and such owner or owners shall be entitled to a *preferred* claim upon such assets," whether or not the fund representing such item can be traced and identified. (Italics ours.) In other words, the owner of an item like those in controversy here becomes automatically preferred as to all the assets of the bank unless he or the collecting bank as his agent or subagent has elected to treat the items as dishonored and have recourse to prior parties.

Both claimants here say they have not so elected and are, therefore, automatically entitled to preference under section 350-l, subdivision 2.

The petitioner says:

1. That the Federal Reserve, as agent for all owners, including Dillon, Read & Co., elected to treat the items as dishonored by non-payment under section 350-j and, therefore, section 350-l, subdivision 2, does not apply, and

2. That section 350-l, subdivision 2, has no application because it applies only where the drawers have been discharged under the law of the State existing prior to the enactment of article 19-A (the petitioner claiming that they were not so discharged), and

3. That it was not the intent of the Legislature to create a trust and a resulting preference except when (as under the old trust doctrine) there was cash on hand or on deposit in other banks equal to the total of the items presented and stamped paid, which there was not in the present case.

Did Federal Reserve elect to treat the items claimed upon as dishonored by non-payment (Section 350-j)? This question must be determined by its overt acts and not by its secret intent. However, in determining its intent, we should not only consider the acts done *but its purpose in doing them.* We should also consider the relation of Federal Reserve and its duty to prior parties growing out of the statutes (Section 350-a) and the agreement between forwarders and collecting bank. (Regulations J, Federal Reserve board, effective September 1, 1930.)

Federal Reserve (1) on Saturday, December thirteenth, when it did not receive remittance on the items forwarded on Thursday, the eleventh, prepared advices of no returns thereon; and (2) on Monday morning, December fifteenth, when it heard that State Bank was closed, sent telegraph or telephone messages to forwarding banks advising that their items were unpaid. After the remittance drafts were dishonored, Federal Reserve (3) charged back to the forwarding banks all the unpaid items, and (4) sent debit advices to each forwarding bank.

If Federal Reserve elected to treat the items as dishonored, it probably would have taken all these steps, but does the fact that it took these steps necessarily indicate an intent to treat the items as dishonored? *It is not enough that Federal Reserve's acts were consistent with an election to dishonor. Do they point affirmatively, without other purpose, to such election?*

It was acting as agent. It was its duty to keep its principal advised. Failing to receive any remittance, on Saturday, December eleventh, it telephoned State Bank and was advised that a remittance draft had been mailed. If so the items had not yet been dishonored. Still Federal Reserve began the preparation of advices of no returns in order to keep the forwarding banks advised of the status of the collection. On Monday morning, December fifteenth, at ten o'clock, Federal Reserve telephoned or telegraphed the principal forwarders as follows: " Items * * * on State Bank Binghamton * * * unpaid. Drawee in hands of State Banking Department." This does not indicate an intent to treat the items as dishonored. The items were unpaid even though they constituted a preferred claim.

As to the charge back, the credit entered on the books of Federal Reserve was revocable (Section 350-a) and could be withdrawn. It did not represent an unconditional indebtedness on the part of Federal Reserve until it received payment in " actually and finally collected funds." (Regulation J, § V, par. 6.)

Regulation J, section V, paragraph 6, provides that " The amount of any check for which payment in actually and finally collected funds

is not received *shall be charged back* to the forwarding bank, regardless of whether or not the check itself can be returned." (Italics ours.) It is immaterial that these regulations are " self imposed law " or otherwise. They are the regulations under which Federal Reserve receives and forwarders send items, and naturally should be observed, whether they have any effect upon the liability of prior parties or not.

As to the " debit advice," it was sent from the Federal Reserve " Bookkeeping Division Adjusting Section." It read as follows: " Your account has been debited for an item drawn on the State Bank * * *. Draft received in remittance * * * has been dishonored and drawee bank reported in hands of State Banking Department. *Please let us know if you wish us to include the above mentioned item in the claim we expect to file against the closed bank in behalf of endorsing banks.*" (Italics ours.) Does this indicate an intent to treat the items as dishonored? Does it not indicate the contrary? True, if it intended to treat them as dishonored, it would have charged them back and advised the forwarding banks to that effect. *But it would have done the same if it did not intend to treat the items as dishonored. An act done for a particular purpose does not necessarily indicate an intent to accomplish another purpose.* Furthermore, the debit advice goes farther. It inquired whether prior parties wished Federal Reserve " to include the above * * * item in the claim we expect to file." It did not say preferred claim but it is fair to say that it had a preferred claim in mind. If it, acting for its forwarders and the owners of the forwarded item, filed a claim, it would naturally be under section 350-1 for preference. If the items were to be passed back to prior parties, they would ordinarily file their own claim.

All the acts done by Federal Reserve were necessary, or at least proper, for the single purpose of keeping the forwarding banks advised and protecting itself and them against the revocable credits which had been given when the items were received. Those acts do not affirmatively indicate an intent to treat the items as dishonored.

Moreover, Federal Reserve did not take certain steps which it naturally would have taken if it had intended to treat the items as dishonored. This indicates a lack of such intent. It neither protested nor recalled the items. If it intended to treat the items as dishonored, it would have protested those as to which protest was not waived. Even though such formal protest by notary public was not necessary, it is in accord with universal banking usage and practice and required by the instructions of the forwarders. No reason is suggested why Federal Reserve should have violated either usage or instructions. In the present case Federal Reserve was

instructed to " Protest dishonored items of $10.01 or over except those bearing * * * no protest symbol." (Federal Reserve Circular No. 1005, § V.) About sixty of the items should, under these instructions, have been protested if dishonored. None were.

We conclude that Federal Reserve did not elect to treat the items as dishonored. (*Matter of Jayne & Mason*, 140 Misc. 822, 825, cited with approval in *Jones* v. *Board of Education*, 242 App. Div. 17, 25.) We might well have rested our decision upon the above authority. However, petitioner's attorney urged its position so earnestly and exhaustively that we have been led to consider it at this length. In *Jones* v. *Board of Education* (*supra*) there was an undoubted election. At page 25 the court said: " By the return of the item * * * it [Federal Reserve Bank] withdrew itself from the situation. * * * This was an election to dishonor the check." *Malcolm, Inc.*, v. *Burlington City Loan & T. Co.* (170 Atl. 32) sustains respondents' claim that the items in question had not been treated as dishonored, that no elections to do so had been made. It is on appeal and it appears to have been a fact, though not relied on, that there was sufficient cash in the bank to meet the items when presented.

The petitioner also contends that section 350-l, subdivision 2, applies *only* where the drawers have been *discharged* under the law of the State as it existed *prior* to the Collection Code and, he says, that according to such law the drawers were not here discharged. Section 350-l, subdivision 2, reads: " When * * * such drawee [bank] shall * * * close * * * after having charged such item or items to the account of the maker or drawer thereof or otherwise, discharged his liability thereon." Petitioner construes this as though it read " discharged according to the [pre-existing] law of the state apart from the Collection Code."

Parenthetically, in McKinney's Laws and the Session Laws a comma appears after the word " otherwise." It tends to becloud the meaning. The comma is absent in the corresponding section (13) of the Bank Collection Code, handed up by petitioner's counsel, and is absent in the copy of said Code considered by the Assembly committee in preparing and enacting article 19-A. (See affidavit of Assemblyman Robinson.) Apparently the comma was inserted through error in drafting the bill or printing the statute. In fact the briefs occasionally omit the comma when using the language of the statute.

Whether the items here were, under previously existing State law, paid or unpaid, we cannot agree with petitioner's contention. We read the section to include items charged to the account of the maker (regardless of whether the maker's liability is thereby, under

the pre-existing law of the State, discharged) *and* items as to which the maker's liability has been otherwise discharged. The Legislature was adopting an entirely new code of collection. Its purpose was to join with other States in securing *uniformity*. *If the courts read in pre-existing laws of the various States or construe the section in accord therewith, uniformity will not result.* To do so would only perpetuate the conflicting rules, continue the confusion and thwart the legislative purpose. In construing a statute expressed in reasonably clear language, the court should neither read in nor read out.

Further, petitioner claims that section 350-l, subdivision 2, does not apply here because State Bank's *total cash* on hand, including its balances on deposit with other banks, was *less than the total of the items so presented* when the respective groups of items were received.

While we hold the amount of cash on hand and on deposit in other banks to be immaterial, we think the respondents have failed to show that the amount exceeded the total of the items presented. In their effort to do so they included not only the deposit balances on the respective days, but items in process of collection by, or in transit to, the depositor. But they apparently ignored the charges against such deposit on the respective days.

The petitioner says that the Legislature intended to embody the above referred to trust doctrine and that a necessary element of that doctrine was that the payee bank, when it received and charged up an item or items, have on hand or on deposit in other banks cash equal to amount of the item or items. He says there can be no trust without a *res* and that this cash was the *res*, while in the present case, there being insufficient cash, there is no *res*, therefore, no trust.

The answer to this argument seems to be that the Legislature made " the assets " of the bank, cash and other assets, the *res*. When it said " the assets " it knew that it was impressing a trust, not only on the cash but upon the other property of the bank. True, the draftsman said: " There is much conflict in the decisions over the right to preference in payment of collection proceeds out of the assets of a failed bank. The purpose of this section is to establish uniform rules based on the better reasoned decisions," apparently meaning the trust doctrine cases. But that does not compel the conclusion that the doctrine as a whole, and all its elements, were adopted. Knowing that that doctrine impressed a trust only upon the cash on hand or on deposit in other banks, the draftsman and the Legislature failed to incorporate such an element or limitation in the statute enacted. Instead it provided that all the assets should be impressed with a trust. If it so intended, it could easily have provided that the cash assets only be so impressed. It is not for the courts to impose such restriction. We should

neither read in the word " cash " nor read out the word " assets." Here again, if the *res* of the trust is to be determined by the prior existing laws of the various jurisdictions, the uncertainty and conflict of those authorities will be perpetuated and the uniformity sought for will be strangled in its inception. While adopting the trust method, the Legislature indicated the final result to be obtained, by providing that the owners " shall be entitled to a preferred claim upon such assets."

The presence or absence of sufficient cash to cover the items presented is, we think, immaterial. We might have rested our decision upon *Matter of Brewer Company* (144 Misc. 429), but this particular phase of the question, which is so insistently urged here, seems to have been neither raised nor considered there. (See, also, *Andrew* v. *Farmers' & Merch. Sav. Bank*, 215 Iowa, 1336; 247 N. W. 797, 799, 800.)

The petitioner cites *State ex rel. Sorensen* v. *Farmers State Bank*, *etc.* (125 Neb. 427; 250 N. W. 557). In sustaining a preference there, the court called attention to the fact that there was cash in the bank sufficient to pay the item. It did not, however, base its decision on that fact. In commenting on the case, Professor Townsend, whose articles have been much quoted by petitioner, said: " The court mentioned the fact that the issuing bank had on hand cash sufficient to pay the cashier's check; it seems clear that the court's statement had no reference to the applicability of this section but was made with a mind to a requirement enunciated in preference cases not decided under the statute."

The petitioner questions the constitutionality of the act if construed as we construe it. In the few cases in this State and cases in other jurisdictions construing this and similar acts, their constitutionality does not seem to have been questioned or passed upon. The statute creates a trust with a resulting preference to a class, namely, those owners who have caused their items drawn by one having a sufficient deposit balance, to be presented in due course and charged to the drawers but who have not received actual payment. We think the act is constitutional. The result may be, as argued by the petitioner, absurd, unjust, unfair and inequitable as against general depositors but such argument must be addressed to the Legislature and not to the court.

Finally the petitioner says that State Bank was insolvent from its inception, that the receipt of *all* deposits was a fraud upon all depositors and, therefore, the moneys deposited remained the property of the depositors who have " a charge " upon all the assets of the bank which take precedence to the trust impressed upon such assets by section 350-l, subdivision 2.

Passing the question as to whether the fact of the bank's insolvency from its inception should be decided here upon affidavits, and assuming that it was so insolvent, we do not think the rights of the depositors take precedence. The statute impresses a trust upon all the assets. The liquidator holds subject to that trust. Section 156 of the Banking Law provides (as to a private bank) that the claims of depositors " shall be preferred " against assets derived from the investment of deposits or set aside for employment in the business of the bank. In *Matter of Brewer Company (supra)* the Superintendent urged that under said section the depositors were preferred ahead of other claims including claimants under the trust created by section 350-l, subdivision 2. The court held otherwise, saying (at p. 434), " but if under the statute a trust is created and if all of the assets are impressed with that trust * * * how can the *cestui que trust*, the beneficial owners of the items represented by the claim, be deprived of some part of the trust fund? * * * That [remittance] draft represents the money due to the persons who own such items and as to which under the statute as it now exists a fiduciary relation was created. * * * The purpose, the plain intent, the clear and unmistakable meaning of the provision is that such preferred claims shall be paid in full." When section 350-l, subdivision 2, was adopted, the Legislature, of course, knew of section 156 of the Banking Law. When section 350-l, subdivision 2, was adopted, the Legislature likewise knew the rights of depositors whose deposits have been knowingly taken when the bank was insolvent. In either event we think it intended to make the claim of the beneficiaries of the trust which it created superior to the claims of depositors.

The item of the respondent Dillon, Read & Co., and possibly some of the items included in the claim of the respondent Federal Reserve, are cashiers' checks. Does the trust created by section 350-l, subdivision 2, inure to the benefit of the owners of cashier's checks? The section reads in part as follows: " when a drawee or payor bank has presented to it for payment an item or items drawn upon or payable by or at such bank *and at the time has on deposit to the credit of the maker or drawer an amount equal to such item or items.*" (Italics ours.) A cashier's check is drawn by the bank on itself. The item of Dillon, Read & Co. read as follows:

" STATE BANK OF BINGHAMTON

" BINGHAMTON, N. Y., *Dec.* 9, 1930. No. 23697.

" Pay to the Order of Dillon Read & Co. $30350.00 Thirty thousand three hundred fifty dollars

" ANDREW J. HORVATT,

" Cashier's Check." " *Cashier.*"

Of course, the item was not drawn by Andrew J. Horvatt individually. As cashier he was signing for the bank. When this item was presented, did State Bank have " on deposit to the credit of the maker or drawee [State Bank] an amount equal to such item? " We think not. Where a customer deposits funds with a bank, such funds become the property of the bank and the depositor a creditor of the bank to that extent. The amount or balance due the depositor is his " deposit." A bank may purchase property, securities or the like, but the property or securities delivered to the bank upon such purchase do not constitute a deposit in favor of any one. A bank may have assets in the shape of capital, surplus or undistributed profits but it has no deposit with itself. In the present case State Bank did not even have such assets. It was insolvent. ( United States Pipe & Foundry Co. v. City of Hornell, 146 Misc. 812, 817.) When it made its cashier's check, it not only did not have " on deposit * * * an amount equal to such item," but it had no net assets to meet it. We do not think the Legislature intended to impress a trust for the benefit of the holder of such cashier's check. It clearly intended to impress a trust in favor of the holder of an item drawn by a third party, a customer, a depositor in the ordinary sense of the word, who had on deposit a deposit balance to his credit equal to the item.

A cashier's check is but an acknowledgment of a debt. Dillon, Read & Co. had on November 20, 1930, sold State Bank certain bonds. It unconditionally accepted the credit of State Bank therefor. On December ninth State Bank issued the cashier's check in question as evidence of the debt, payable, as the debt already was, on demand.

A cashier's check, so called, differs radically from an ordinary check. The latter is an order upon a bank purporting to be drawn upon a deposit. It is an order on a specific deposit balance. Not so a cashier's check. It is merely an evidence or acknowledgment of an indebtedness with an agreement to pay on demand. " The [cashier's] check was not drawn by a depositor against a deposit, but was simply an acknowledgment of an indebtedness on the part of the bank to the payee of the order. As between the bank and appellant it was, in legal effect, the same as a certificate of deposit or a certified check * * *. It is urged that the giving of the check ' passed the title to the money.' That might be so * * * had the check been drawn against a fund in another bank, as against a claim for the same money by some third party. But as against a bank drawing a check upon itself no change in title was thereby made. The check was equivalent to an acknowledgment of indebtedness. The payee was entitled to the money before

the check was drawn, and he or the holder of the check was entitled to it afterwards in the same manner and to the same extent." (*Clark* v. *Chicago Title & Trust Co.*, 186 Ill. 440; 53 L. R. A. 232.) (See, also, *Drinkall* v. *Movius State Bank*, 11 N. D. 10; 57 L. R. A. 341, 344; 5 Ruling Case Law, 483, § 5; *Steinmetz* v. *Schultz*, 59 S. D. 603, 615; 241 N. W. 734, 739.)

The petition alleges: " said State Bank of Binghamton charged said cashiers' checks or such other items to outstanding cashiers' checks or to such other outstanding items." Apparently when State Bank issued cashiers' checks it, as matter of bookkeeping, set them up as a liability in a separate liability account. When such a check came in and was paid, it " charged " it, that is, it reduced the liability shown by that account and by paying it reduced its already depleted assets. The State Bank became liable to Dillon, Read & Co. when it purchased the bonds on credit. When it issued its cashier's check it changed that liability from an account payable to an outstanding cashier's check, nothing more.

Respondent Dillon, Read & Co. points out that *State ex rel. Sorensen* v. *Farmers'*, *etc.* (*supra*) allowed a preference on a cashier's check. This question, however, was not discussed and apparently not raised.

We hold that Dillon, Read & Co. is not entitled to priority on its claim. A reference may be necessary to determine whether any cashiers' checks or other similar items not entitled to priority are included in Federal Reserve's claim.

It is claimed that certain substantial items included in Federal Reserve's claim have been filed directly against State Bank by drawers in their own behalf. This would indicate that the drawers had reimbursed the payee. If the collecting agent (Federal Reserve) elected to treat the items as dishonored and hold prior parties, the payee would undoubtedly be bound by such election. We have held that Federal Reserve did not so elect. That being so, the payee owner " could make the election in place of its subagent [Federal Reserve]." No notice of such election is required. (*Jones* v. *Board of Education, supra*, 25.) If a payee accepts reimbursement from the drawer of an item, it must, we think, be held to have treated the item as dishonored. It thereby had recourse upon a prior party. It waived the priority given by section 350-l, subdivision 2. It, therefore, becomes necessary to determine whether any payee whose item is included in Federal Reserve's claim has so elected. To that end a reference may be necessary.

Petitioner may submit proposed order in accordance herewith to respondents. If necessary, order may be settled on notice or by appointment.